## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP.,** | § § § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-00230** |
| | § | |
| **APPLE INC.,** | § | **JURY TRIAL DEMANDED** |
| **CAPITAL ONE, N.A.,** | § | |
| **CAPITAL ONE SERVICES, LLC,** | § | |
| **FROST BANK, and** | § | |
| **CULLEN/FROST BANKERS, INC.** | § | |
| | § | |
| **Defendants.** | § | |

## WAPP'S OPPOSITION TO CAPITAL ONE'S MOTION
## TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 1

III.    LEGAL STANDARDS ....................................................................................... 2

IV.     ARGUMENT ...................................................................................................... 4

    A.    *Alice* Step 1: The Claims Recite Non-Abstract Inventions ......................................... 4

        1.    Solution 1: Simulation of Specific Mobile Device Types and Characteristics ........................................................................ 6

        2.    Solution 2: Simulation of Specific Mobile Network Characteristics ................ 10

        3.    Solution 3: Profiling to Identify Resource Constraints ..................................... 13

        4.    The "Asserted Claims" are Patent Eligible at Step 1 ........................................ 16

        5.    '192 Patent Claim 60 is Eligible at Step 1.......................................................... 22

        6.    Capital One Fails to Address Limitations in Every '811 and '579 Claim.......... 23

        7.    The "Other Claims" are Also Patent Eligible at Step 1 ..................................... 24

    B.    *Alice* Step 2: The Claims Recite Transformative Inventive Concepts ..................... 25

        1.    Solution 1 is Inventive and Unconventional ...................................................... 26

        2.    Solution 2 is Inventive and Unconventional ...................................................... 27

        3.    Solution 3 is Inventive and Unconventional ...................................................... 27

        4.    The Combination of Multiple Solutions Embodied in Each Claim is Inventive and Unconventional.............................................................. 28

        5.    Capital One's Step 2 Arguments Lack Merit ..................................................... 29

        6.    Capital One Fails to Address the "Other Claims" ............................................. 30

V.      CONCLUSION.................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121, 1128 (Fed. Cir. 2018) ................................................................. 3, 26

*Affinity Labs of Tex. v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ......................................................................... 5, 19

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016) ............................................................................ 19

*Aftechmobile Inc. v. Salesforce*,
   853 F. App'x 669 (Fed. Cir. 2021) ........................................................................ 18

*Alice Corp. Pty. v. CLS Bank Int'l*,
   134 S. Ct. 2347, 2355 (2014) ..................................................................... 2, 3, 25

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ..................................................................... 2

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
   827 F.3d 1341, 1350 (Fed. Cir. 2016) .................................................................... 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 2

*Berkheimer v. HP Inc.*,
   881 F.3d 1360, 1368 (Fed. Cir. 2018) ............................................................. passim

*Bowlby v. City of Aberdeen, Miss.*,
   681 F.3d 215 (5th Cir. 2012) ................................................................................... 2

*CardioNet, LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ............................................................................. 17

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343, 1347-48 (Fed. Cir. 2014) ................................................................ 3

*Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc.,
   880 F.3d 1356 (Fed. Cir. 2018) ....................................................................... 16, 24

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999, 1011 (Fed. Cir. 2018) ........................................................ 5

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) .............................................................. 21

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327, 1335 (Fed. Cir. 2016) .................................................. 2, 4

*Enserion, LLC v. Orthofix, Inc.*,
  No. 4:20-cv-108-ALM, Dkt. 26 (E.D. Tex. Sept. 16, 2020) ...................... 23

*Gravel Rating Systems, LLC v. McAfee, LLC*,
  No. 4:21-cv-259-ALM, Dkt. 35 (E.D. Tex. Nov. 15, 2021) ................... 4, 26

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143 (Fed. Cir. 2019) .................................................. 9, 12, 15

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .................................................................. 2

*Luminati Networks Ltd. v. Teso LT*,
  No. 2:19-CV-00395-JRG, 2021 U.S. Dist. LEXIS 28060, (E.D. Tex. Feb. 12, 2021) ............ 25

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299, 1314 (Fed. Cir. 2016) .................................................. 3, 5

*MyMail, Ltd. v. ooVoo, LLC*,
  934 F.3d 1373, 1379 (Fed. Cir. 2019) ................................................ 2, 23

*RFC Lenders of Texas, LLC v. State Farm Mutual Automobile Insurance Co.*,
  No. 4:20-cv-628-ALM, Dkt. 30 (E.D. Tex. Jan. 5, 2021) ........................... 3

*Simio, LLC v. Flexsim Software Prods.*,
  983 F.3d 1353 (Fed. Cir. 2020) .......................................................... 5, 18

*SRI Int'l, Inc. v. Cisco Sys.*,
  918 F.3d 1368 (Fed. Cir. 2019) .............................................................. 21

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278, 1294-96 (Fed. Cir. 2020) ................................................. 5

*Tiare Tech., Inc. v. Whataburger Rests., LLC*,
  No. 2:22-cv-0182-JRG-RSP, 2023 U.S. Dist. LEXIS 54813, (E.D. Tex. Mar. 15, 2023) ....... 25

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303, 1307 (Fed. Cir. 2020) ................................................................. passim

**Statutes**

35 U.S.C. §101 ......................................................................................................... passim

**Rules**

Fed. R. Civ. P. 12 ................................................................................................... passim

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp (collectively, "WAPP"), respectfully ask the Court to deny the Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) filed by Defendants Capital One, N.A. and Capital One Services, LLC (collectively, "Capital One"). Dkt. 59 ("Motion" or "Mot.").

## I.    INTRODUCTION

WAPP's claims are patent eligible. They recite specific, concrete solutions that improve the operation of computers and mobile application development tools. The claims as a whole are also transformative and unconventional, introducing new solutions that were not known in the prior art. Capital One does not clearly and convincingly prove otherwise. At Step 1, Capital One oversimplifies the claims by failing to account for specific, concrete claim limitations. At Step 2, Capital One ignores the evidence and allegations in the Amended Complaint showing the claims are inventive and not directed to well-known techniques, which at a minimum, raises factual disputes that must be resolved in WAPP's favor at the pleading stage.

## II.    BACKGROUND

As described in WAPP's 120-page Amended Complaint ("FAC"—Dkt. 55), the Asserted Patents cover innovative and non-abstract improvements in the "development and testing of applications for mobile devices." FAC ¶76. This Court has presided over six prior lawsuits involving some or all of WAPP's Asserted Patents, and has issued multiple orders construing their claims. FAC ¶¶183-88. In WAPP's lawsuit against MicroFocus, this Court held a trial in which the "jury awarded WAPP $172,554,269.00, which was 100% of WAPP's requested damages; the Court subsequently entered final judgment in favor of WAPP, confirming the jury's damages award, and granting WAPP's motion for judgment as a matter of law regarding validity." *Id.* ¶184.

Other than Capital One, no prior or current defendant has ever filed a motion arguing that WAPP's claims are ineligible under §101. There is a reason no defendant has ever tried to do this: WAPP's claims are plainly §101 eligible, and Capital One's arguments to the contrary lack merit.

## III.    LEGAL STANDARDS

In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). When considering a Rule 12(b)(6) motion, all well-pleaded facts are assumed to be true and those facts are viewed in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). A complaint must merely plead "enough facts to state a claim [for] relief that is ***plausible*** on its face."[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

Patent eligibility under 35 U.S.C. §101 may be determined on a Rule 12 motion, but only when there are no factual allegations that, if taken as true, prevent resolving the eligibility question as a matter of law. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019).

To determine whether claims contain patent-eligible subject matter, courts apply the *Alice* two-step framework. First, the court "determine[s] whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). To do so, the court looks to the claims' "character as a whole." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). While all claims embody abstract ideas and other ineligible subject matter at some level, the court's task is to examine "whether the claims [] focus on a specific means or method that improves the relevant technology or are instead directed

---

[1] All emphases are added unless expressly noted to the contrary.

to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

Second, if the challenged claims recite a patent-ineligible concept, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Alice*, 134 S. Ct. at 2355. This step is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014).

The Federal Circuit has explained that "[w]hile the ultimate determination of eligibility under §101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). For example, "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that must be "proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Additionally, specific improvements described in a patent specification, "to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Id.* at 1369.

Courts in this district routinely deny Rule 12 motions to dismiss on §101. *See, e.g.*, *RFC Lenders of Texas, LLC v. State Farm Mutual Automobile Insurance Co.*, No. 4:20-cv-628-ALM, Dkt. 30 at 3 (E.D. Tex. Jan. 5, 2021) ("Plaintiff has stated plausible claims for purposes of defeating a Rule 12(b)(6) motion" challenging §101 eligibility); *Gravel Rating Systems, LLC v.*

*McAfee, LLC*, No. 4:21-cv-259-ALM, Dkt. 35 at 9 (E.D. Tex. Nov. 15, 2021) (Plaintiff's "allegations suggest that the claimed invention is directed to an improvement in the computer technology itself … The Court is unconvinced Defendants have met their burden" under §101).

## IV.    ARGUMENT

WAPP asserts five patents in the Amended Complaint. Dkt. 55 ("FAC"). All of the asserted patents' claims pass the *Alice* test for subject matter eligibility.

### A.    *Alice* Step 1: The Claims Recite Non-Abstract Inventions

WAPP's claims succeed at step 1. The "Patents-in-Suit teach and claim particularized solutions for developing reliable mobile applications, which improves the performance of the mobile device (i.e., a computing device)" and which "improve[s] the functioning of mobile application development and testing software and result[s] in the development of more reliable and efficient mobile applications." FAC ¶¶107, 111. In other words, the claims are "directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020). Here "we are not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation. Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). As a result, "the claims at issue are not directed to an abstract idea." *Id.*

Capital One's own formulation of the alleged abstract idea underscores that the claims are not abstract. Capital One alleges the claims are directed to "the abstract idea of testing and displaying information about how mobile applications perform in different devices or networks." Mot. at 10. Capital One offers a slightly different formulation in the Background section, stating the claims cover "systems for testing and displaying information about how mobile applications operate in different networks and/or mobile device conditions, to assist software developers." Mot.

4

at 3. These summaries are incomplete. Yet even Capital One's flawed summaries demonstrate the non-abstract nature of the claims: the claims recite a specific implementation of concrete steps that provides a particular solution to a problem in the software arts ("testing…how mobile applications operate in different networks and/or mobile device conditions" and "displaying information…to assist software developers") by improving the functionality of the computer itself. Capital One's own formulation of the alleged abstract idea is strikingly more concrete than the ideas found to be abstract in the cases Capital One cites. *See, e.g.*, *Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) ("out-of-region delivery of regional broadcasting"); *Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353, 1360 (Fed. Cir. 2020) ("using graphics instead of programming to create object-oriented simulations").

Yet Capital One's characterization is still incomplete: it violates the Federal Circuit's mandate to "avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO*, 837 F.3d at 1313; *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-96 (Fed. Cir. 2020) (rejecting characterization that "disregard[ed] elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements"); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018) ("[The step one] inquiry requires that the claims be read as a whole").

WAPP's claims recite multiple non-abstract solutions to specific problems in the field of mobile application development. This brief will focus on three non-abstract solutions embodied in the claims and discussed in the Amended Complaint: "(1) emulation/simulation[2] of specific mobile

---

[2] The Court has construed the words "emulate" and "simulate" to have the same meaning in the context of Wapp's claims. Wapp Tech Ltd. Partnership v. JPMorgan Chase Bank, N.A., Case No. 4:23-cv-1137, Dkt. 80 at 15 (E.D. Tex. Nov. 19, 2024). Likewise, in this brief, both terms have the same meaning.

device types, (2) emulation/simulation of the specific networks mobile devices operate on, and (3) identifying what specific parts of the mobile application are performing poorly due to resource limitations through profiling in a simulated (resource-constrained) environment, providing multiple profile displays in realtime or in reports, and correlating the resource utilization to the parts of the application responsible for the resource usage." FAC ¶103.

1. <u>Solution 1: Simulation of Specific Mobile Device Types and Characteristics</u>

The inventor of WAPP's Patents, Donavan Poulin, realized "that attempts to adapt application development tools previously targeted at the desktop computer market (such as Flash and Java) to work for mobile devices were deficient because they failed to provide the ability to develop and test for the large number of diverse mobile device types." FAC ¶79. Because developers were "not capable of simulating how the application would operate on a specific type of mobile device model," their application "may operate correctly on one mobile device model" but "it may crash when playing on a different mobile device model." *Id.* "The only way that such issues could be detected and avoided was to have access to 'all available mobile devices' and 'transfer[] and test[] [the application] on a mobile device representative of each targeted mobile device type'—something which simply was not possible at the time." *Id.* Moreover, "even if a developer somehow had access to every possible type of physical mobile device, it would have been a virtual impossibility to repeatedly transfer the application under development to each mobile device type for testing across the number of development cycles typically required to develop a satisfactory mobile application." *Id.* ¶80.

In the context of an improved software development tool, Mr. Poulin invented a concrete solution to this problem: "the ability to emulate/simulate each of the specific mobile device types" including "emulating/simulating mobile device characteristics that are indicative of the performance of specific mobile device types." FAC ¶85. This "Solution 1" is claimed in Asserted

6

Claims[3] 60 of the '192 Patent, 1 of the '811 Patent, and 15 of the '579 Patent.

The specification gives specific examples of such mobile device characteristics in Table 1:

| TABLE 1 | |
|---|---|
| Mobile Device Characteristics | |
| Parameter | Value |
| Name | NOKIA 3650 |
| Processor | ARM 4T |
| Processor Speed | 104 MHz |
| Storage Access Speed | 5.88 files/second |
| RAM Size | 256 MB |
| Storage Size | 512 MB |
| Display Width | 256 |
| Display Height | 394 |
| Pixel Depth | 24 |
| Processor Availability | 60% |
| RAM Availability | 60% |
| Storage Availability | 40% |

FAC ¶85.

"The Patents-in-Suit further teach how to utilize these mobile device characteristics to emulate/simulate a mobile device." *Id.* ¶87. For example, "FIG. 1A shows one exemplary embodiment of a system for emulating, authoring and visually profiling an application playing on a mobile device." *Id.* ¶¶87-88. Moreover, Figure 5 shows "an example of using these mobile device characteristics to simulate/emulate a mobile device type." *Id.* ¶89.

---

[3] For purposes of this brief, Wapp uses Capital One's nomenclature and refers to the claims charted in the FAC as the "Asserted Claims." The claims asserted by Wapp against Defendants in this lawsuit are not limited to these so-called "Asserted Claims." Wapp will timely disclose a complete list of its asserted claims in compliance with P.L.R. 3-1 when it serves its infringement contentions.



*Id.* Here, "the user has selected a Nokia 3650 mobile phone, and the relevant device characteristics (including CPU Speed and Disk Access speed) are used to emulate/simulate the mobile device. … By testing on various emulated or simulated mobile devices with different characteristics, users can identify problems they might otherwise miss if they only tested on a single device type. 'For example, a NOKIA 6600 has a 16% reduction in ARM CPU speed and available memory resources compared to a NOKIA 7610, thus an application that plays correctly on the NOKIA 7610 may not play correctly on the NOKIA 6600 due to this drop in inherent resources.'" *Id.* ¶90.

"Solution 1" is not abstract because it represents a specific implementation rather than a mere desired result. The claims and specification recite a specific manner of performing device

simulation: using mobile device characteristics. *See, e.g.*, '811 Claim 1 ("simulate at least one of the one or more **characteristics indicative of the mobile device corresponding to the selected mobile device model**"). This is akin to the claims that were found eligible at Step 1 in *Koninklijke*:

> By requiring that the permutation applied to original data be modified "***in time***," claim 2, which is incorporated into all appealed claims, ***recites a specific implementation*** of varying the way check data is generated that improves the ability of prior art error detection systems to detect systematic errors. … [The claims] recite a sufficiently specific implementation (i.e., modifying the permutation applied to the original data "in time") of an existing tool (i.e., check data generating device) that improves the functioning of the overall technological process of detecting systematic errors in data transmissions.

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019). Like the claims in *Koninklijke* that required a specific implementation of data modification ("in time"), WAPP's Solution 1 requires a specific implementation of simulation (using mobile device characteristics). WAPP's Solution 1 is a "specific implementation" (generating mobile device simulations based on specific mobile device characteristics) "of an existing tool" (an application development tool) "that improves the functioning of the overall technological process" by enabling developers to "identify problems they might otherwise miss if they only tested on a single device type." FAC ¶¶90, 108.

"Solution 1" also provides "concrete improvements to the functioning of mobile application development and testing software" by enabling mobile application developers to "confirm that their mobile applications will not crash or perform unacceptably on specific devices." FAC ¶¶103-106. This is akin to the claims in *Uniloc*, where the Federal Circuit found the claims were "directed to a patent-eligible improvement to computer functionality, namely the reduction of latency experienced by parked secondary stations in communication systems." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020). The *Uniloc* court held "the claimed invention changes the normal operation of the communication system itself to 'overcome a problem specifically arising

in the realm of computer networks'" thereby enabling "the communication system to accommodate additional devices … without compromising performance." *Id.* at 1308. Likewise, WAPP's "Solution 1" changes the operation of conventional development tools by enabling simulation of mobile device characteristics, thereby overcoming a problem specifically arising in the realm of mobile application development tools—namely, ensuring that the application will run properly across a large number of mobile device models. FAC ¶¶103-106.

2.    <u>Solution 2: Simulation of Specific Mobile Network Characteristics</u>

Mr. Poulin also realized "mobile devices often operate in different network conditions than desktop computers" and it was therefore "important to not only run tests to verify that a mobile application's network communications operated correctly, but also to test that the mobile application would be responsive despite the varied network conditions that a mobile device was likely to encounter during mobile use." FAC ¶81. However, "at the time it was not possible to 'measure and emulate network characteristics within each market' as needed to perform those kinds of network tests." *Id.* ¶82. "For example, both Flash/Flash Lite and Java/J2ME did not provide network emulation/simulation to enable testing against the range or plurality of network characteristics that a mobile device was likely to encounter in various mobile environments (or mobile markets). These shortcomings meant that it was not possible with the existing Flash/Flash Lite and Java/J2ME tools to adequately test different network conditions through simulation." *Id.*

Mr. Poulin invented a concrete solution to this problem: "simulation/emulation of networks that a mobile device is likely to encounter during real world usage by using specific network characteristics indicative of how a mobile device will perform when executing the mobile application under those conditions." FAC ¶92. This "Solution 2" is claimed in Asserted Claims 1 of the '192 Patent, 1 of the '864 Patent, 1 of the '678 Patent, and 1 of the '811 Patent.

For example, Figure 12 shows an embodiment that enables a user to select desired network

10

characteristics relevant to a mobile device for simulation:



FAC ¶95. "The window shows a list of network characteristics (such as bandwidth) that may be simulated." *Id.* ¶96. The specification also provides specific disclosures about how this network simulation using network characteristics is accomplished: "Thus, as application 104 plays within model 102, the effects of device 114 interacting with a wireless network are simulated such that frame based profile data display 110 shows resource utilization that includes the live or scripted effects of interaction with the wireless network." *Id.* ¶94. "A developer could then use the network simulation to identify portions of the mobile application that function poorly when forced to operate on the slower or less reliable connections sometimes found on public networks." *Id.* ¶92.

11

"Solution 2" is not abstract. Like "Solution 1," it represents a specific implementation rather than a desired reslult. The claims and specification recite a specific manner of performing network simulation: using network characteristics. *See, e.g.*, '192 Claim 1 ("simultaneously visually emulate … a plurality of network characteristics indicative of performance of the mobile device when executing the application"). Like the claims in *Koninklijke* that required a specific implementation of data modification ("in time"), WAPP's Solution 2 requires a specific implementation of simulation (using network characteristics). WAPP's Solution 2 is a "specific implementation" (generating network simulations based on specific network characteristics) "of an existing tool" (an application development tool) "that improves the functioning of the overall technological process" by enabling developers to "identify portions of the mobile application that function poorly when forced to operate on the slower or less reliable connections sometimes found on public networks." FAC ¶92; *Koninklijke*, 942 F.3d at 1151.

"Solution 2" also provides "concrete improvements to the functioning of mobile application development and testing software" by enabling developers to ensure "that their mobile applications will not crash or perform unacceptably on specific … networks due to exceeding resource availability (*e.g.*, exceeding … network resources available to the application on devices connected to slower mobile networks)." FAC ¶¶103-106. Again, this is like the *Uniloc* claims found eligible at Step 1. WAPP's "Solution 2" changes the operation of conventional development tools by enabling simulation of network characteristics, thereby overcoming a problem specifically arising in the realm of mobile application development tools—namely, ensuring that the application will run properly across a large range of mobile networks. FAC ¶¶103-106; *Uniloc*, 957 F.3d at 1308.

Solution 2's eligibility is also underscored by arguments Defendant Apple made when prosecuting its own '613 Patent. FAC ¶¶202-10. During prosecution of Apple's '613 patent, "the

examiner rejected claims 1-6 under § 101 for being directed to non-statutory subject matter" and also "rejected all 29 claims under § 102 and § 103 as being anticipated by WAPP's patent 8,332,203 (which is in the same family of WAPP's asserted patents) or rendered obvious…." *Id.* ¶204. Apple amended the claims and argued "amended claim 1 now recites the limitations of '***simulating wireless transmission of mobile content to a mobile device based on a connection simulation selected by a user***,' which clearly requires the system of claim 1 to be implemented and cannot be carried out mentally or verbally. Therefore, Applicants respectfully request that the §101 rejections against claims 1-6 be withdrawn." *Id.* ¶205. The examiner agreed that this amendment overcame the §101 rejection and allowed the claims. *Id.* ¶208. Thus, "Apple expressly stated in the office action response that a form of network simulation is eligible subject matter for patents" and the examiner agreed. *Id.* The network simulation claimed in Apple's '613 Patent is less concrete than Solution 2, because Solution 2 recites a specific implementation of network simulation using network characteristics. As alleged in the FAC, Apple's prosecution arguments and the PTO's finding that those arguments were correct, further support the eligibility of WAPP's claims.

### 3.    Solution 3: Profiling to Identify Resource Constraints

Mr. Poulin also "recognized that new types of mobile application development tools and user interfaces would also be needed to enable a developer to not just identify that problems existed, but also to identify which parts of the application were underperforming and causing problems, for example, because the capabilities of one or more available resources of the mobile device (e.g., CPU, memory, etc.) were not adequate to process the application." FAC ¶83. He set out to address "the problem of how to quickly identify what parts of the mobile application are performing poorly due to resource limitations so that the poorly performing code can be corrected." *Id.* ¶97.

Mr. Poulin invented a concrete solution to this problem: "particular tools to help identify specific parts of the mobile application that experience problems when certain resources are

stressed." FAC ¶98. This "Solution 3" is claimed in Asserted Claims 1 and 60 of the '192 Patent, 1 of the '864 Patent, 1 of the '678 Patent, 15 of the '579, and 1 of the '811 Patent.

"The Patents-in-Suit detail multiple exemplary profilers that monitor and record profiled data including resources used by the application." *Id.* Figure 2 of the spec describes "exemplary profile modules (including processor, memory, graphics, and system)...." *Id.* "The profiled data that these profilers generate can be used to create displays that enable developers and testers to quickly identify where the resource utilization is occurring." *Id.* ¶100. For example, in the embodiment of Figure 3, the profiled data "displays processor resource utilization by frame" and enables the user to identify which "frames of application 104 exceed the available processor resources of mobile device 114; thus application 104 may capout or crash when playing those frames." *Id.* ¶101.



*Id.* "Furthermore, the Patents [ ] teach producing these displays in real time as the application is running to better pinpoint which functionality is causing excessive resource usage." *Id.* "Additionally, the Patents [ ] teach corresponding the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization, making it possible to quickly identify and correct the code responsible for the resource utilization." *Id.* ¶102.

"These are not generic data and displays, but rather a specific system of monitoring

resources in the newly resource-constrained testing environment taught by the Patents-in-Suit, which includes a resource-constrained mobile device model and/or a resource-constrained network connection." FAC ¶101. These profilers "provide[] previously unavailable details about mobile device performance within resource-constrained simulations/emulations, including the utilization and availability of mobile device resources." *Id.*

"Solution 3" is not abstract. "The Patents [ ] teach specific solutions for using a profiler to monitor resource usage of the mobile application as it runs, generating one or more graphical images of resource utilization based on the profile data, and using the profile data to identify areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected." FAC ¶110. This is again like the claims in *Koninklijke*: WAPP's Solution 3 is a "specific implementation" (using a profiler to monitor resource usage of the mobile application as it runs to identify areas of the application responsible for the displayed resource utilization) "of an existing tool" (an app development tool) "that improves the functioning of the overall technological process" by enabling developers to "identify areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected." FAC ¶110; *Koninklijke*, 942 F.3d at 1151.

Likewise, Solution 3 provides "concrete improvements to the functioning of mobile application development and testing software" by enabling mobile app developers to, for example, "use the improved tools to identify what specific part of the application caused the crash" or "identify what part of the application was causing the increased network utilization." FAC ¶¶103-105. This is again analogous to the *Uniloc* claims found eligible at Step 1. WAPP's "Solution 2" changes the operation of conventional development tools by enabling app developers to "identify areas of the application responsible for the displayed resource utilization," thereby overcoming a

problem specifically arising in the realm of mobile application development tools—namely, ensuring that "mobile applications will not crash or perform unacceptably on specific devices and networks due to exceeding resource availability." FAC ¶¶106, 110; *Uniloc*, 957 F.3d at 1308.

Solution 3 is also analogous to the claims that passed muster under Step 1 in *Core Wireless*. There, the claims were "directed to a particular manner of summarizing and presenting information in electronic devices" and were found eligible under Step 1 because they "disclose a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods to display a generic index on a computer." *Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc., 880 F.3d 1356, 1362-63 (Fed. Cir. 2018). The claims were patent eligible because they improved "the efficiency of using the electronic device" and the "speed of a user's navigation through various views and windows." *Id.* at 1263. Here, Solution 3 discloses a specific manner of displaying specific information using "a profiler to monitor resource usage of the mobile application as it runs, generating one or more graphical images of resource utilization based on the profile data, and using the profile data to identify areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected." FAC ¶110. The profile displays of Solution 3 allow mobile app developers to "better pinpoint which functionality is causing excessive resource usage" and "quickly identify and correct the code responsible for the resource utilization." *Id.* ¶¶101-102. Solution 3, like the *Core Wireless* claims, improves the efficiency and speed of using and navigating the mobile app development tool.

### 4.    The "Asserted Claims" are Patent Eligible at Step 1

Capital One focuses its arguments on what it calls the "Asserted Claims," i.e., the claims charted in the FAC: Claims 1 and 60 of the '192 Patent, claim 1 of the '864 Patent, claim 1 of the '678 Patent, claim 15 of the '579, and claim 1 of the '811 Patent. Mot. at 5, 9-17. Each of these claims recites ***at least two*** of the three concrete, non-abstract Solutions described above. FAC

¶¶117-182. Claim 1 of the '811 Patent recites *all three* Solutions. FAC ¶171. To pass muster under *Alice* Step 1, it would be sufficient for a claim to cover just one non-abstract solution, but each Asserted Claim covers at least two.

Capital One mounts two primary arguments at Step 1. First, it wrongly argues that the Asserted Claims "provide no details explaining *how* to implement the recited functions" and "require no technologically improved way to achieve those functional results—no particular rules, algorithms, or explanation of how to implement them." Mot. at 11. As shown, this is incorrect. The claims and spec recite specific details about how to implement the claimed solutions, and the advantages of doing so. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369-70 (Fed. Cir. 2020) (specification's identification of invention's advantages supports the conclusion that the invention is not an abstract idea). Solution 1 recites a specific way of performing device simulation: using mobile device characteristics. FAC ¶108. Solution 2 recites a specific way of performing network simulation: using network characteristics. *Id.* ¶109. Solution 3 recites a specific way of "using a profiler to monitor resource usage of the mobile application as it runs, generating one or more graphical images of resource utilization based on the profile data, and using the profile data to identify areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected." *Id.* ¶110.

Capital One's recent IPR filing contradicts its arguments here. For example, in the IPR, Capital One argued that "Poulin-910[4] also notes that the increase in the number of mobile devices 'requires that applications designed to run on these mobile devices also sustain rapid development' and ***provides techniques*** for such rapid development." *Capital One, N.A. v. Wapp Tech Corp.*, No.

---

[4] "Poulin-910" is U.S. Patent No. 7,813,910, which issued from the earliest non-provisional application in the '192 Patent's priority claim.

IPR2025-01325, Paper 2 at 50 (P.T.A.B. July 18, 2025). Thus, Capital One concedes that the claimed inventions are not merely results-oriented, but rather provide specific "techniques" to enable rapid development of applications across a wide range of mobile devices. Capital One also conceded in the IPR that Poulin-910's teachings enable "reduced software development costs and faster software development," i.e., the claimed "techniques" improve the function of the computer itself. *Id.*

The cases Capital One cites underscore the non-abstract nature of WAPP's claims. In *Aftechmobile*, the claims were directed to "the abstract idea of enabling the creation of mobile applications without coding by combining pre-coded software components" and "nowhere recited how the program code was written or how it worked to accomplish those functions." *Aftechmobile Inc. v. Salesforce*, 853 F. App'x 669, 669 (Fed. Cir. 2021). The "recitation of desired functions without corresponding recitations on how to achieve or implement those functions leaves the claims devoid of anything but the abstract idea." *Id.* As shown, the Asserted Claims and the spec recite specific techniques for how to achieve and implement the claimed Solutions 1, 2, and 3.

Similarly, in *Simio*, the claim was "directed to the abstract idea of using graphics instead of programming to create object-oriented simulations." *Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353, 1360 (Fed. Cir. 2020). The claim was directed to "applying the already-widespread practice of using graphics instead of programming to the environment of *object-oriented* simulations," which "is no more than an abstract idea." *Id.* "[T]he use of conventional or generic technology [i.e., graphical processing generally] in a . . . well-known environment [i.e., object-oriented simulations], without any claim that the invention reflects an inventive solution to any problem presented by combining the two" rendered the claim ineligible. *Id.* As shown above, Solutions 1, 2, and 3 are ***not*** merely the application of "conventional" or "widespread" practices

18

in a "well-known environment." Rather, as the spec shows and the FAC alleges, the "Solutions of the Patents-in-Suit as embodied in the claims were not conventional at the time of invention." FAC ¶112; *see also id.* ¶¶113-16 (alleging in detail how the Solutions are unconventional). Moreover, unlike in *Simio*, WAPP has shown "how the *computer's* functionality is improved." *Simio*, 983 F.3d at 1361 (emphasis in original). The FAC shows in detail how the claimed Solutions "provide concrete improvements to the functioning of mobile application development and testing software." *See, e.g.* FAC ¶¶103-06.

Capital One also cites *Affinity Labs I* where the claims recited the abstract "concept of providing out-of-region access to regional broadcast content…." *Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016). The court noted that this was a conventional idea ("such out-of-region broadcasts have been common-place since the late 20th century") and that "[t]here is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself." *Id.* This is unlike the claims of the WAPP's patents. As noted above, the specification and the FAC demonstrate that Solutions 1, 2, and 3 were not "conventional" or commonplace. *See* FAC ¶¶112-16. Moreover, WAPP's claims and specification provide specific techniques for "how" to implement each of the claimed solutions, and describe the advantages of doing so. *See* FAC ¶¶ 108-10.

Similarly, in *Affinity Labs II* the claims covered "streaming content generally" and "the delivery of media content to electronic devices was well known long before the priority date of the '085 patent." *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269-70 (Fed. Cir. 2016). Moreover, the Patent did "not disclose any particular mechanism for wirelessly streaming content to a handheld device." *Id.* at 1269. Unlike *Affinity Labs II*, WAPP's specification and FAC demonstrate that Solutions 1, 2, and 3 were not "conventional" or well known. *See* FAC ¶¶112-

19

16. Moreover, as discussed above, WAPP's claims and specification provide specific mechanisms for "how" to implement each of the claimed solutions. *See* FAC ¶¶108-10.

Second, Capital One wrongly argues that the Asserted Claims "address a *human* problem—the tedious work of 'manual[ly]' testing an application in different physical devices and different network locations—not a *technological* problem." Mot. at 14-15 (emphases in original). This argument is wrong from the get-go because "testing an application in different physical devices and different network locations" is not a "human problem." Applications can only be run and tested on **computers**, and the problem of testing mobile applications across a wide range of particular mobile devices and mobile networks is a problem that only arises in the realm of computers and networks. The claimed Solutions solve computer-specific problems and provide "concrete improvements to the functioning of mobile application development and testing software" resulting in better-performing mobile device applications and mobile devices. FAC ¶¶103-06.

Moreover, each of the claimed Solutions recites specific details about how to implement the claimed solutions, and **none** of these claimed solutions can be implemented "manually" by a human. A human cannot "manually" simulate a mobile device using specific mobile device characteristics, as required by Solution 1. A human cannot "manually" simulate a mobile network using specific network characteristics, as required by Solution 2. And a human cannot "manually" "monitor resource usage of the mobile application as it runs, generating one or more graphical images of resource utilization based on the profile data, and using the profile data to identify areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected" as required by Solution 3. FAC ¶110.

The Federal Circuit rejected a similar argument in *SRI*—the court found claims directed to monitoring network activity eligible at Step 1 because "the human mind is not equipped to detect

20

suspicious activity by using network monitors and analyzing network packets as recited by the claims." *SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368, 1376 (Fed. Cir. 2019). The claims were not abstract because they were not directed to "automating a conventional idea on a computer" but rather "improve[d] the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security." *Id.* Likewise, the human mind is not equipped to implement WAPP's claimed Solutions, which provide specific, unconventional techniques for improving the function of mobile app development software. *See* FAC ¶¶107-111.

Capital One also cites various cases holding the mere "collection, analysis, and/or display of information" is ineligible. These cases are not applicable because the claimed Solutions are not limited to the mere collection, analysis, or display of information. For example, Capital One cites *Electric Power,* where the court found the claims abstract because they were directed to "abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation)" and did not include "any particular assertedly inventive technology for performing those functions." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). As the Federal Circuit noted, "[t]he Electric Power claims were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves." *SRI Int'l*, 918 F.3d at 1375 (Fed. Cir. 2019).

Here, WAPP's claims do not merely recite "collecting and analyzing information." Each claimed Solution improves the function of the computer by enabling it to ***generate*** new and useful models that could not previously be generated, using specific inventive techniques for doing so. Solution 1 ***generates*** a simulated mobile device model based on specific techniques using mobile device characteristics. FAC ¶108. Solution 2 ***generates*** a simulated mobile network model based on specific techniques using network characteristics. *Id.* ¶109. Solution 3 uses these new models

21

to "*generat[e]* one or more graphical images of resource utilization based on the profile data, and using the profile data to *identify* areas of the application responsible for the displayed resource utilization so that performance issues in the source code can be quickly identified and corrected." *Id.* ¶110.

In sum, Capital One fails to show that any Asserted Claim is directed to an abstract idea, because the claimed Solutions recite "how" to implement the recited functions using specific techniques, and because each Solution solves a problem specific to the realm of computers by implementing concrete solutions that humans cannot perform manually.

### 5. '192 Patent Claim 60 is Eligible at Step 1

Capital One raises an additional argument against '192 claim 60. Capital One argues claim 60 is a "product-by-process" claim, and therefore contends that only the "ultimate product, not the underlying process" may be considered in the §101 eligibility analysis. Mot. at 17-18.

Claim 60 "is a 'system' claim reciting structure, not a product-by-process claim reciting the steps of a process by which an end product is made." FAC ¶218. As shown in detail in the FAC, "[p]roduct-by-process claims require recital of an end product, and then a series of steps by which the product is made." *Id.* ¶¶219-25 (collecting examples of product-by-process claims, such as: "A storage medium manufactured in accordance with a process comprising the steps of…").

Claim 60, by contrast, "does not recite any steps" and is instead a system claim that "recites only structure, namely, an 'application' structure that is developed using a 'software authoring platform' structure…." *Id.* ¶226. "Claim 60 includes at least a first structural component, i.e., 'an application,' that is 'developed using' a second structural component, i.e., a 'software authoring platform,' with a specific configuration. There is no series of steps recited to make the 'system' or the 'application.'" *Id.* ¶227.

To the extent Capital One disagrees with WAPP's interpretation of claim 60, the parties

have a claim construction dispute. Either the Court would need to adopt WAPP's construction at the 12(b)(6) stage (concluding claim 60 is ***not*** a product-by-process claim) or the Court would need to wait to resolve this dispute at the claim construction stage. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019) ("if the parties raise a claim construction dispute at the Rule 12(c) stage, the district court must either adopt the non-moving party's constructions or resolve the dispute to whatever extent is needed to conduct the § 101 analysis"); *Enserion, LLC v. Orthofix, Inc.,* No. 4:20-cv-108-ALM, Dkt. 26 at 3 (E.D. Tex. Sept. 16, 2020) (denying §101 Rule 12(b)(6) Motion because "[d]etermining the claims' scope—and thus whether they are directed at patent-ineligible subject matter—often requires claim construction.'"). Regardless of which option the Court chooses, Capital One's Motion should be denied as to '192 claim 60.

### 6.     Capital One Fails to Address Limitations in Every '811 and '579 Claim

Capital One's Motion completely ignores the "drill down"[5] limitations present in every claim of the '811 and '579 Patents. For example, '811 Claim 1 recites "correspond the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization." And '579 Claim 15 recites "correspond the utilization of a specific displayed resource at a given time with one or more functions, or code, or both of the application responsible for that utilization."[6] These specific limitations are non-abstract and improve the functioning of the computer and the mobile application development tool by enabling mobile application developers to "quickly and efficiently identify the source code responsible for the displayed resource utilization." FAC ¶¶170, 181.

This is like the invention in *Core Wireless*, where "prior art interfaces required users to

---

[5] Relating "functions of the application" with specific resource utilization allows the developer or "software instructions" to *drill down* to those corresponding functions.
[6] Capital One's reproduction of claims in its Appendix A omits this limitation of '579 Claim 15.

drill down through many layers to get to desired data or functionality" which "could seem slow, complex and difficult to learn…." *Core Wireless*, 880 F.3d at 1363. The claims recited an inventive concept eligible at Step 1 because the "invention improves the efficiency of using the electronic device…." *Id.* "The speed of a user's navigation through various views and windows can be improved because it 'saves the user from navigating to the required application, opening it up, and then navigating within that application to enable the data of interest to be seen or a function of interest to be activated.'" *Id.* Likewise, these "drill down" limitations in every '811 and '579 claim are non-abstract at Step 1 because they improve the functionality and efficiency of the computer and the mobile application software development tool, enabling the user to "quickly and efficiently identify the source code responsible for the displayed resource utilization." FAC ¶¶170, 181.

Capital One's failure to address this "drill down" limitation at all means that its Motion must necessarily fail at Step 1 for all claims of the '811 and '579 Patents.

### 7.    The "Other Claims" are Also Patent Eligible at Step 1

Capital One's Motion glosses over what it calls "other claims," i.e., the claims of the Asserted Patents that Capital One does not refer to as "Asserted Claims" because they are not charted in the FAC. Mot. at 22-28. Capital One alleges that these "other claims" "closely track the Asserted Claims" and argues that the other claims' additional limitations are "insignificant additions" or "incidental limitations" and can thus be ignored. *Id.* at 22, 25. For example, in its cursory analysis, Capital One ignores the fact that "other claims" recite ***all three*** of Mr. Poulin's Solutions and claim specific implementations of those Solutions. *See, e.g.,* '579 Patent Claim 18.

Capital One does not meet its burden to show the "other claims" are ineligible. The movant bears the burden to sufficiently address the eligibility of each claim. *See Luminati Networks Ltd. v. Teso LT*, No. 2:19-CV-00395-JRG, 2021 U.S. Dist. LEXIS 28060, at *7 (E.D. Tex. Feb. 12, 2021) (movant "bears the burden of either addressing the eligibility of each Asserted Claim or

making a showing of the representativeness of any claims asserted to be representative."). Capital One's cursory dismissal of myriad limitations as "insignificant" or "incidental" is insufficient to meet its burden of "conduct[ing] an analysis tethered to the claim language, to show that there are no legally relevant distinctions between the claim identified as representative and the remaining asserted claims." *Tiare Tech., Inc. v. Whataburger Rests., LLC,* No. 2:22-cv-0182-JRG-RSP, 2023 U.S. Dist. LEXIS 54813, at *5 (E.D. Tex. Mar. 15, 2023). The Motion should be denied as to the "other claims" because it has failed to meet its burden to meaningfully address those claims.

Moreover, assuming for the sake of argument that the "other claims" "closely track the Asserted Claims" as Capital One alleges, then those "other claims" should be found patent-eligible at *Alice* Step 1 for the same reason the Asserted Claims are eligible at Step 1. As shown, each Asserted Claim recites at least two non-abstract Solutions, and each Solution includes specific techniques that improve the functioning of the computer itself. Accordingly, both the "Asserted Claims" and the "other claims" are patent eligible at *Alice* Step 1.

**B.    *Alice* Step 2: The Claims Recite Transformative Inventive Concepts**

Assuming for the sake of argument that the claims are directed to an abstract idea, they are still patent eligible under *Alice* step two because the claim elements, both individually and as an ordered combination, transform the nature of the claim into a patent eligible application. *Alice*, 573 U.S. at 217. "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367 (internal quotations omitted). "[W]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* at 1368. "Moreover, the inventive concept need not be explicitly recited in the claims, but instead can be established elsewhere in the evidence." *Gravel Rating Systems, LLC v.*

*McAfee, LLC*, No. 4:21-cv-259-ALM, Dkt. 35 at 8 (citing *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020)).

WAPP added roughly 60 new pages of detailed pleadings demonstrating that the claims of the Asserted Patents are patent eligible. *Compare* Dkt. 1 (64-page initial complaint) *with* Dkt. 55 (120-page FAC). This includes detailed allegations with citations to the intrinsic record showing that Solutions 1, 2, and 3 were inventive and ***not*** well-understood, routine, or conventional at the time of the invention. FAC ¶¶112-16.

Because WAPP has plausibly alleged the claims are inventive, Capital One's Motion must be denied at the Rule 12 stage as a matter of law. The Federal Circuit has expressly stated: "'[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6).'" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019) (quoting *Aatrix*, 882 F.3d at 1126-27). Where the plaintiff "made specific, plausible factual allegations about why aspects of its claimed inventions were not conventional … [t]he district court erred by not accepting those allegations as true." *Id.* at 1317-18. This Court must not "err[] by ignoring the principle, implicit in *Berkheimer* and explicit in *Aatrix*, that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101." *Id.* at 1318. Once WAPP's pleaded allegations are accepted as true, this Court "cannot conclude that the asserted claims lack an inventive concept" at this pleadings stage. *Id.*

### 1.    Solution 1 is Inventive and Unconventional

The FAC alleges: "emulation/simulation of specific mobile device types utilizing characteristics of those mobile device types was not conventional." FAC ¶113. It goes on to support this allegation with specification cites showing that the inadequacies of the prior art such as Flash and Java. *Id.* The FAC explains that "prior solutions, such as Flash, could not sufficiently emulate hardware characteristics to show that a mobile application would work on a targeted

mobile device type. Other prior art discussed by the Patents-in-Suit (such as Java/J2ME) similarly failed to provide the kind of emulation/simulation of specific mobile device types necessary to test resource utilization on those specific device types." *Id.* ¶114. Because WAPP has "made specific, plausible factual allegations about why" Solution 1 was "not conventional," this precludes dismissal at the Rule 12 stage. *Cellspin*, 927 F.3d at 1317-18.

### 2.    Solution 2 is Inventive and Unconventional

The FAC alleges: "emulation/simulation of the specific networks that mobile devices operate on was not conventional." FAC ¶115. This allegation is also supported by citations to the specification showing "at the time of invention it was 'not possible' to 'measure and emulate network characteristics within each market [for mobile devices]'" and "[p]rior art such as Flash did not provide any emulation/simulation of mobile network characteristics, much less in a manner that was indicative of performance of the mobile device when executing a mobile application." *Id.* WAPP's "specific, plausible factual allegations about why" Solution 2 was "not conventional" precludes dismissal at the Rule 12 stage. *Cellspin*, 927 F.3d at 1317-18.

### 3.    Solution 3 is Inventive and Unconventional

The FAC alleges the Asserted Patents' "specific solutions for identifying what specific parts of the mobile application were performing poorly due to resource limitations were not conventional at the time of invention." FAC ¶116. "The art at the time" such as Flash and Java, "did not include real time monitoring and display of multiple resources being used as the application was executed. Nor did the art include the ability to correspond the utilization of the displayed resources with the functions of the application responsible for the utilization." *Id.* "The novel approach of the Patents-in-Suit made it possible for developers and testers to quickly identify mobile application code that was using excessive resources and optimize that code before it caused issues for end users of the mobile application." *Id.* The "Patents-in-Suit provided new 'tools' to

developers, enabling 'measurements' that were previously impossible to obtain." *Id.* WAPP's "specific, plausible factual allegations about why" Solution 3 was "not conventional" precludes dismissal at the Rule 12 stage. *Cellspin*, 927 F.3d at 1317-18.

        4.   <u>The Combination of Multiple Solutions Embodied in Each Claim is Inventive and Unconventional</u>

Each "Asserted Claim" recites at least two inventive Solutions. The FAC addresses each Asserted Claim individually, identifies the Solutions it embodies, and shows how the particular ordered combination of claim limitations is inventive and unconventional. FAC ¶¶117-82.

For example, the FAC spends about three pages analyzing the specific limitations of '811 Patent claim 1 to show that it is inventive and unconventional as an ordered combination. *Id.* ¶¶165-71. "[T]he non-conventional and non-routine combination of claim elements" in the '811 Patent "differed markedly from and improved upon what may have been considered conventional, generic, or routine." *Id.* ¶166. "The claims are not directed to an abstract idea; instead, they recite concrete improvements specific to computer technologies, the claimed elements cannot be performed in the human mind, and each claim recites one or more inventive concepts." *Id.* at 167.

The FAC goes on to quote '811 Patent claim 1 and analyze the language of that claim. FAC ¶¶167-71. The FAC alleges that Solution 1 is embodied in '811 claim 1: "display[ing] a list of a plurality of mobile device models from which a user can select, wherein each model includes one or more characteristics indicative of a corresponding mobile device" and "simulat[ing] at least one of the one or more characteristics indicative of the mobile device corresponding to the selected mobile device model." *Id.* ¶168. The FAC describes how Solution 1 is inventive and unconventional in the context of that claim. *Id.* The FAC also alleges that Solution 2 is embodied in '811 claim 1: "simulat[ing] one or more characteristics indicative of a network on which the mobile device corresponding to the selected mobile device model can operate." *Id.* ¶169. The FAC

describes how Solution 2 is inventive and unconventional in the context of that claim. *Id.* The FAC also alleges that Solution 3 is embodied in '811 claim 1: "monitor[ing] utilization of a plurality of resources over time as the application is running," "display[ing] simultaneously two or more graphical images of the application's resource utilization, wherein each graphical image relates to a different resource," and "correspond[ing] the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization." *Id.* ¶170. The FAC also describes how Solution 3 is inventive and unconventional in the context of that claim. *Id.* Finally, the FAC describes how this combination of Solutions 1, 2, and 3 in '811 claim 1 "provides even more of an improvement than the individual elements standing alone." FAC ¶171. Thus the FAC alleges that the ordered combination of multiple inventive Solutions in '811 claim 1 is itself inventive and unconventional.

The FAC includes allegations at this level of detail for *every* Asserted Claim. FAC ¶¶117-29 ('192 claim 1); ¶¶130-35 ('192 claim 60); ¶¶136-47 ('864 claim 1); ¶¶148-60 ('678 claim 1); ¶¶172-82 ('579 claim 15). WAPP's claim-by-claim "specific, plausible factual allegations about why" each Asserted Claim is "not conventional" precludes dismissal at the Rule 12 stage. *Cellspin*, 927 F.3d at 1317-18.

### 5.    Capital One's Step 2 Arguments Lack Merit

Capital One disagrees with WAPP's allegations in the FAC and argues "WAPP's claims recite only generic computing components … and generic computing functions…." Mot. at 19. Capital One's three pages of briefing on Step 2 are largely just a repetition of this same point: Capital One believes the claims recite only "generic" elements and are not inventive. *Id.* at 19-22.

Capital One's arguments regarding Step 2 at best raise fact disputes about whether the Asserted Claims are inventive or conventional. *Berkheimer*, 881 F.3d at 1368 ("whether a claim element or combination of elements is well-understood, routine and conventional to a skilled

29

artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence"). As discussed above, WAPP has pleaded that each Asserted Claim is inventive and is **not** well-understood, routine and conventional and has supported those allegations with evidence. All of WAPP's well-pleaded allegations must be taken as true at the Rule 12(b)(6) stage and all fact disputes must be resolved in WAPP's favor. Capital One's Motion therefore fails at Step 2. The fact that Capital One disagrees with WAPP's allegations is irrelevant at the Rule 12 stage.

Capital One's argument also ignores the holding of the Federal Circuit's seminal "step two" case—a novel arrangement of known components can be an inventive concept. *See BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *Cellspin*, 927 F.3d at 1318 ("Implementing a well-known technique with particular devices in a specific combination … can be inventive."). Even if Capital One was correct (it is not) that each individual component was "generic," the claims are still inventive as a "novel arrangement" of such components. The FAC alleges and shows that the specific arrangement of the elements of the Asserted Claims is inventive and unconventional. FAC ¶¶117-82.

### 6.    Capital One Fails to Address the "Other Claims"

As discussed above, Capital One largely ignores the "other claims." Mot. at 22, 25. This cursory analysis does not satisfy Capital One's burden to prove by "clear and convincing evidence" that these claims were "well-understood, routine and conventional." *Berkheimer*, 881 F.3d at 1368. Capital One's failure to meet its burden on these claims at Step 2 means its Motion must be denied. However, to the extent the "other claims" are similar to the Asserted Claims as Capital One alleges, then they are eligible at Step 2 for the same reasons as the Asserted Claims.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Capital One's Motion.

DATED: September 19, 2025          Respectfully submitted,

/s/ *Alden G. Harris*
Leslie V. Payne
State Bar No. 0784736
lpayne@hpcllp.com
R. Allan Bullwinkel
State Bar No. 24064327
abullwinkel@hpcllp.com
Alden G. Harris
State Bar No. 24083138
aharris@hpcllp.com
Christopher L. Limbacher
State Bar No. 24102097
climbacher@hpcllp.com
Carlos I. Ruiz
State Bar No. 24110614
cruiz@hpcllp.com
HEIM PAYNE & CHORUSH, LLP
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

**ATTORNEYS FOR PLAINTIFFS WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via ECF on September 19, 2025.

/s/ *Alden G. Harris*
Alden G. Harris