# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP, *Plaintiffs* | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:25-CV-230 (Judge Mazzant) |
| APPLE INC., CAPITAL ONE, N.A., CAPITAL ONE SERVICES, LLC, FROST BANK, and CULLEN/FROST BANKERS, INC., *Defendants* | § § § § § § § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp.'s ("Plaintiff's" or "Wapp's") Opening Claim Construction Brief (Dkt. #136). Also before the Court is the Responsive Claim Construction Brief (Dkt. #144) filed by Defendants Apple Inc., Capital One, N.A., Capital One Services, LLC, Frost Bank, and Cullen/Frost Bankers, Inc. ("Defendants") as well as Plaintiff's reply (Dkt. #151). Further before the Court are the parties' February 19, 2026 P.R. 4-3 Joint Claim Construction Statement (Dkt. #132) and the parties' April 14, 2026 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. #159).

The Court held a claim construction hearing on April 23, 2026, to determine the proper construction of the disputed claim terms in United States Patents No. 8,924,192, 9,298,864, 9,971,678, 10,353,811, and 10,691,579.

The Court issues this Claim Construction Memorandum Opinion and Order and hereby incorporates-by-reference the claim construction hearing and transcript.

**BACKGROUND**

Plaintiff alleges infringement of United States Patents No. 8,924,192 ("the '192 Patent"), 9,298,864 ("the '864 Patent"), 9,971,678 ("the '678 Patent"), 10,353,811 ("the '811 Patent"), and 10,691,579 ("the '579 Patent") (collectively, the "patents-in-suit").

The '192 Patent, titled "Systems Including Network Simulation for Mobile Application Development and Online Marketplaces for Mobile Application Distribution, Revenue Sharing, Content Distribution, or Combinations Thereof," issued on December 30, 2014, and bears an earliest priority date of June 10, 2005.  The Abstract of the '192 Patent states:

> A system and methods emulate an application executing in real time in a mobile device. The mobile device is emulated in real time using a model running on a processor extrinsic to the mobile device. The model is based on characteristics indicative of performance of the mobile device. The application is executed in real time within the model and the application executing in the model is monitored to determine resource utilization information by the application for the mobile device. The resource utilization information for the mobile device is displayed.

Plaintiff submits (Dkt. #136, at p. 1):

> The patents-in-suit are all within the same patent family and relate back to U.S. Patent No. 7,813,910 (which is not asserted in this case). The '192, '678, and '811 Patents are continuations of the '910 Patent and generally share the same specification. The '864 and '579 Patents are divisions of a continuation-in-part (U.S. Patent No. 8,589,140) of the '910 Patent. As such, they include essentially the same specification as the '192, '678, and '811 Patent continuations. The '678 and '811 Patents also incorporate the '192 Patent specification. *See* ['678 Patent] at 1:8-18; ['811 Patent] at 1:7-19. Thus, the citations herein are typically to the '192 Patent specification for simplicity.

The Court previously construed disputed terms in all five of the patents-in-suit in *Wapp Tech Limited Partnership, et al. v. JPMorgan Chase Bank, N.A.*, No. 4:23-CV-1137, Dkt. No. 80 (E.D. Tex. Nov. 19, 2024) (Mazzant, J.) ("*JPMC*") (attached to Plaintiff's opening claim construction brief as Exhibit 10), and in *WAPP Tech Limited Partnership, et al. v. Bank of America, N.A., et al.*, No. 4:21-CV-670, Dkt. No. 110 (E.D. Tex. July 6, 2022) (Mazzant, J.)

("*Wells Fargo*") (attached to Plaintiff's opening claim construction brief as Exhibit 9). Also, the Court construed disputed terms in the '192 Patent, the '864 Patent, and the '678 Patent in *Wapp Tech Limited Partnership, et al. v. Seattle Spinco, Inc., et al.*, No. 4:18-CV-469, Dkt. No. 176 (E.D. Tex. Apr. 27, 2020) (Mazzant, J.) ("*Micro Focus*") (attached to Plaintiff's opening claim construction brief as Exhibit 8).

Plaintiff submits that the patents-in-suit all have essentially the same specification, so for simplicity the citations herein to the specification are to the '192 Patent. Dkt. No. 136 at 1.

## LEGAL STANDARDS

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.

*Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely,

if ever, correct.'" *Globetrotter Software, Inc. v. Elan Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1324. However, the prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal." *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d

Page **5** of **47**

1352, 1358 (Fed. Cir. 2003).  An "ambiguous disavowal" will not suffice.  *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (citation omitted).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art."  *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful."  *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.  "Indefiniteness must be proven by clear and convincing evidence."  *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions."  *TQP Dev., LLC v. Intuit Inc.*, No.

2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Development, LLC v. Intuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839–40 (2015) ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## ANALYSIS

### *Agreed Claim Terms*

In their February 19, 2026 P.R. 4-3 Joint Claim Construction Statement (Dkt. #132 at 2) and in their April 14, 2026 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. #159, Ex. A at pp. 31–32), the parties submitted the following agreed-upon constructions, which the Court hereby adopts as agreed-upon:

| Term | Agreed Construction |
|---|---|
| "simulate"<br><br>('192 Patent, Claim 1)<br>('864 Patent, Claim 1)<br>('678 Patent, Claim 1)<br>('811 Patent, Claims 1, 22, 24)<br>('579 Patent, Claim 33) | "emulate" |
| "emulate"<br><br>('192 Patent, Claims 1, 60) | Plain meaning |
| "simultaneously visually emulate, via one or more profile display windows"<br><br>('192 Patent, Claims 1, 60) | "emulate simultaneously, and display one or more windows showing resources of the mobile device that are available to the application" |
| "simultaneously visually simulate, via one or more profile display windows"<br><br>('678 Patent, Claim 1) | "emulate simultaneously, and display one or more windows showing resources of the mobile device that are available to the application" |
| "simulate, via one or more profile display windows"<br><br>('864 Patent, Claim 1) | "emulate, and display one or more windows showing resources of the mobile device that are available to the application" |
| "one or more profile display windows"<br><br>('192 Patent, Claims 1, 60)<br>('864 Patent, Claims 1)<br>('678 Patent, Claims 1) | "one or more windows showing resources of the mobile device that are available to the application" |
| "configured to"<br><br>('192 Patent, Claims 1, 60–61)<br>('864 Patent, Claims 1, 8)<br>('678 Patent, Claim 1) | "actually programmed to" |
| "software authoring platform"<br><br>('192 Patent, Claim 60) | Plain meaning |

*Disputed Claim Terms*

### 1. "system for [testing/developing] an application for a mobile device"

| **"system for developing an application for a mobile device"** ('192 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| The preamble is limiting; plain meaning | "system that emulates a mobile device for developing an application for the mobile device" |
| **"system for testing an application for a mobile device"** ('864 Patent, Claim 1; '678 Patent, Claim 1) | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| The preamble is limiting; plain meaning | "system that simulates a mobile device for testing an application for the mobile device" |

(Dkt. #132, Ex. A at p. 2; *id.*, Ex. B at pp. 1 & 5; Dkt. #159, Ex. A at pp. 17–18).

### a. The Parties' Positions

Plaintiff submits that it proposes the same construction that the Court has applied in prior cases, and Plaintiff argues that there is no lexicography or disclaimer that would support that additional limitation proposed by Defendants. (Dkt. #136 at p. 6). Plaintiff also argues that "the patents' claims explicitly indicate when the patentee intended to limit a claim to simulating/emulating a 'mobile device,'" and "[s]uch language does not appear in the claims at issue here." (*Id.*; *see id.* at 6–7). Further, Plaintiff argues that "Defendants' proposal would exclude specification embodiments." (*Id.* at 6). For example, Plaintiff argues that "[w]hile the specification does tout the benefits of emulator-based testing, it does not disparage real-device testing nor seek to eliminate it." (*Id.*)

Page **9** of 47

Defendants respond that "[t]hese patents are *not* directed to testing physical mobile devices—the very prior art techniques that the patents endeavor to replace." (Dkt. #144, at p. 21) (footnote omitted).  For example, Defendants submit that "the patents aim to *avoid* the cost of testing on myriad physical mobile devices," and "the specifications only discuss profiling emulated mobile devices, not physical ones." (*Id.*, at pp. 21 & 22).  Defendants argue that "Wapp cherry-picks disclosures from the specifications to argue that the patents embrace testing on physical devices," and "Wapp misreads the sole embodiment it relies on as an example of testing on a physical mobile device." (*Id.*, at pp. 23 & 24) (citations omitted).  Further, Defendants argue that "Wapp's reliance on claim differentiation cannot overcome the overwhelming weight of the disclosures in the asserted patents." (*Id.*, at pp. 24–25) (citation omitted).  Finally, as to the '811 Patent, although "Defendants do not dispute that the preamble can refer to a physical mobile device," Defendants argue that "the disputed limitation, which specifically recites 'monitoring utilization of a plurality of resources,' should be read in the context of the specifications which disclose monitoring resource utilization solely in the context of a simulated mobile device." (*Id.*, at p. 25).

Plaintiff replies that the patents disclose testing on a physical device as part of developing an application, and "Defendants admit they are not advancing a lexicography or disclaimer argument." (Dkt. #151, at p. 1).  Plaintiff also argues that profiling is not the same as emulation and "is not limited to the context of emulation." (*Id.*).

### b. Analysis

Claim 1 of the '192 Patent recites (emphasis added):

1. A *system for developing an application for a mobile device* comprising:
    a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the

application; wherein the software authoring interface is further configured to simulate a network connection state encountered by the mobile device.

Claim 1 of the '864 Patent recites (emphasis added):

> 1. A *system for testing an application for a mobile device* comprising:
> software configured to simulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the network characteristics are based on data of interaction with networks in non-simulated environments.

Claim 1 of the '678 Patent, for example, recites (emphasis added):

> 1. A *system for testing an application for a mobile device* comprising:
> a software testing interface configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application; wherein the bandwidth availability is based at least in part on bandwidth data predetermined from interactions between one or more mobile devices and at least one operator network.

In *Micro Focus*, the Court: found that these preambles are limiting; rejected the defendants' proposal to construe these terms to mean "system that mimics the operation of a real-world mobile device to enable the evaluation of a program designed to run on that real-world mobile device" and "system that mimics the operation of a real-world mobile device to enable the writing of a program designed to run on that real-world mobile device"; and construed these terms to have their plain meanings. *Micro Focus* at 13; *see id.* at 9–13. In *Wells Fargo*, the parties agreed to construe these terms to have their plain meanings. *Wells Fargo* at 8.

In the present case, Defendants emphasize Figure 7 and associated description thereof in the specification. *See* '192 Patent at 9:54–10:29 ("In step 716, method 700 transfers the application to the mobile device."). Figure 7 is reproduced here:



FIG. 7

Defendants also submit that "the patents depict a 'Profiler 106' as a sub-module within 'Emulator 101' and describe monitoring the application within model 102 (another sub-module of emulator 101) to estimate resource usage of application 104," and "[t]he specification, by contrast, contains no disclosures of profiling a physical mobile device." (Dkt. #144, at p. 22) (citing '910 Patent at 3:32–34 & Fig. 2; citing Dkt. #136, Ex. 7, Feb. 19, 2026 Medvidovic Decl. ¶ 70).  Defendants likewise argue that "[t]he patents only describe network simulation for emulated mobile devices, but never physical devices."  (Dkt. #144, at p. 22 n.9) (citations omitted).

On balance, Defendants do not persuasively justify departing from the Court's analysis in *Micro Focus*. *Micro Focus* at 9–13.  As the Court there noted, "'simulate' and 'emulate' appear

in other claim language," and "the specification discloses methods that can include testing an application on a real mobile device."  *Id.* at 12; *see* '192 Patent at 6:65–7:3 (disclosing that an "interface may, for example, allow application 104 to be deployed on mobile device 114 for final testing of application 104").  Defendants argue that the disclosure at 6:65–7:3 is a "generic disclosure without explanation or elaboration on what that testing includes" (Dkt. #144, at p. 23) (citations omitted), but Defendants' argument is unpersuasive when considering that "mobile device" is a broadly used phrase in the relevant art and that Defendants identify nothing approaching a definition or disclaimer.

Defendants also cite authority that statements of purpose can be considered when construing claim terms.  *See St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1240–41 (Fed. Cir. 2020); *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) (discussing "fundamental object of the invention disclosed by the . . . patent specification").  In the present case, however, statements regarding general cost-saving objectives of the claimed inventions (*see* '192 Patent at 1:66–2:3 ("transferring and testing process is time-consuming and therefore costly for the application author")) do not warrant a narrow interpretation of this broad claim language.  The opinions of Defendants' expert in this regard are also unpersuasive.  (*See* Dkt. #144, Ex. 7, Feb. 19, 2026 Medvidovic Decl. ¶¶ 50–80.)

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected

Defendants' construction."); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "system for developing an application for a mobile device" and "system for testing an application for a mobile device" to have their **plain meaning**.

### 2. "monitor utilization of a plurality of resources . . ."

| "monitor utilization of a plurality of resources over time as the application is running" ('811 Patent, Claims 1, 9, 22) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning | "monitor utilization of a plurality of resources of the simulated mobile device over time as the application is running" |

(Dkt. #132, Ex. A at p. 3; *id.*, Ex. B at p. 17; Dkt. #159, Ex. A at p. 19).

### a. The Parties' Positions

Plaintiff argues that this term presents essentially the same dispute as discussed above regarding "system for testing . . ." and "system for developing . . .," and Plaintiff argues that "Defendants' proposed importation of an unclaimed limitation from certain specification embodiments should be rejected." (Dkt. #136, at p. 9). Plaintiff also highlights that "dependent claims in the '811 Patent affirmatively require that the application be transferred to a physical version of the selected mobile device model." (*Id.*) (citing '811 Patent, Cls. 2, 10, 23). Finally, Plaintiff submits that "no prior defendant spanning multiple cases has sought to limit this term to simulated mobile devices." (*Id.* at 9).

Defendants' response and Plaintiff's reply likewise address this term together with the
"system for [testing/developing] an application for a mobile device" terms addressed above.
(Dkt. #144, at pp. 21–25; Dkt. #151, at pp. 1–2).

### b. Analysis

Claims 1 and 2 of the '811 Patent, for example, recite (emphasis added):

1. A non-transitory, computer-readable medium comprising *software instructions
for developing an application to be run on a mobile device*, wherein the software
instructions, when executed, cause a computer to:
    display a list of a plurality of mobile device models from which a user can
select, wherein each model includes one or more characteristics indicative of a
corresponding mobile device;
    simulate at least one of the one or more characteristics indicative of the
mobile device corresponding to the selected mobile device model;
    simulate one or more characteristics indicative of a network on which the
mobile device corresponding to the selected mobile device model can operate;
    *monitor utilization of a plurality of resources over time as the application
is running;*
    display simultaneously two or more graphical images of the application's
resource utilization, wherein each graphical image relates to a different resource;
    correspond the utilization of a specific displayed resource at a given time
with one or more functions of the application responsible for that utilization.

2. The medium of claim 1, wherein the instructions initiate transmission of the
application that is being developed *to one or more physical versions of a mobile
device* corresponding to the selected mobile device model.

Dependent claim 2 implies that "monitor[ing] utilization of a plurality of resources over
time as the application is running" relates to something other than a "physical version[] of a
mobile device," but, because this limitation appears only in the dependent claim, this inference is
limited to the dependent claim. That is, dependent Claim 2 includes all the limitations of the
claim from which it depends (Claim 1), and an inference based on the recital of "one or more
physical versions of a mobile device" might affect what "mobile device" would meet all of the
limitations of Claim 2. This does not require a narrow reading of "monitor utilization of a

plurality of resources over time as the application is running," which, notably, does not include the phrase "mobile device."

Dependent Claims 10 and 23 are similar in relation to Claims 9 and 22, respectively. These dependent claims perhaps give rise to an inference within each dependent claim. Defendants do not persuasively show that any such inferences necessarily reach up into the independent claims.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes "monitor utilization of a plurality of resources over time as the application is running" to have its **plain meaning**.

### 3. "application"

| **"application"** |
|:---:|
| ('192 Patent, Claims 1, 60, 61;<br>'864 Patent, Claims 1, 8;<br>'678 Patent, Claim 1;<br>'811 Patent, Claims 1, 2, 9, 22;<br>'579 Patent, Claims 15, 16) |

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Plain meaning | "Flash or other frame-based application" |

(Dkt. #132, Ex. A at p. 2; *id.*, Ex. B at p. 10; Dkt. #159, Ex. A at p. 23).

#### a. The Parties' Positions

Plaintiff argues that Defendants' proposal imports a limitation from example embodiments, which Plaintiff submits the Court rejected in *JPMC*. (Dkt. #136, at p. 9). Plaintiff also argues that "the intrinsic evidence demonstrates the patentee used 'frame-based application'

when he meant 'frame-based application,' and used the broader term 'application' when referring to applications in general." (*Id.*, at p. 10; *see id.* at pp. 10–11).

Defendants respond that, based on Plaintiff's priority claims, the relevant specification is that of the priority '910 patent," and "[t]he '910 patent is clear that an 'application' refers to a 'Flash or other frame-based application.'" (Dkt. #144, at p. 25–26) (citation omitted). Defendants argue that whereas "Patentees . . . deliberately broadened the disclosures of the '864 patent relative to the priority '910 patent," "Patentees cannot amend the specification seven years after the claimed priority date and use those amendments to argue for a broader construction unsupported by the original application." (*Id.*, at p. 29). Defendants also submit that "[t]he figures consistently refer to a 'Flash' or 'frame-based' application," and "[t]he specification consistently refers to applications as being 'frame-based' or being played in a Flash Player." (*Id.*, at p. 27). Further, Defendants argue that "the only 'emulators' described in the '910 patent are for testing Flash or frame-based applications." (*Id.*, at p. 29) (citations omitted). Finally, whereas the provisional patent application referred to technologies known as "Java, .NET, and BREW," Defendants submit that the patentee later chose to omit this material from the specification. (*Id.*, at pp. 29–30).

Plaintiff replies by reiterating that Defendants improperly attempt to limit the claims to a particular embodiment, and "Defendants misrepresent that Wapp's construction relies on 'new matter' added to the '192 and '864 patents." (Dkt. #151, at p. 2). Plaintiff argues that "[w]hat Defendants ignore is that the parent '910 patent, as well as every asserted patent, incorporates by reference the 2005 provisional patent application (Ex. 11), which means that the disclosures of both the 2005 provisional and the parent '910 patent must be considered." (*Id.*, at p. 3).

### b. Analysis

The Background section of the specification states, for example:

Many new mobile devices include a display management engine called a Flash Player; one example of a Flash Player suitable for mobile devices is Flash Lite, developed by Macromedia. The Flash Player provides a common application platform for playing applications on the mobile devices and allows developers to develop applications that may be played on multiple mobile devices that include the Flash Player. Applications for mobile devices are typically developed on a personal computer (PC) or workstation and target one or more types of mobile device that include a Flash Player. These applications require real-time testing of the application on all applicable mobile devices. Although a Flash Player application may operate correctly on one mobile device model, it may crash when playing on a different mobile device model.

'192 Patent at 1:33–46. Also, the Summary of the Invention refers to embodiments such as "a mobile device that includes a Flash Player." *Id.* at 2:12–57.

In *Micro Focus*, the Court construed "application" to have its plain meaning, rejecting the defendants' proposal of construing this term to mean "program designed to run on a mobile device." *Micro Focus* at 13–16.

In *JPMC*, the Court again construed "application" to have its plain meaning, rejecting the defendants' proposal of construing this term to mean "frame-based application." *JPMC* at 16–19.

Defendants' proposal here—"Flash or other frame-based application"—presents substantially the same dispute presented in *JPMC*, and Defendants do not persuasively justify departing from the Court's analysis in *JPMC*. *Id.* For example, the Court noted that Claim 31 of the '864 Patent expressly recites "[a] method for emulating a *frame-based* application." *Id.* at 17. Authorities cited by Defendants at the April 23, 2026 hearing are unpersuasive. *See, e.g., Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321 (Fed. Cir. 2011) ("The written description repeatedly and consistently defines the invention as a system that processes information derived

from hard copy documents."). Disclosures in the specification regarding "Flash" relate to particular embodiments and do not purport to limit the claimed inventions as a whole. *See, e.g.,* '192 Patent at 4:53–56 ("FIG 1A shows one exemplary embodiment of a system 100 for emulating and profiling a frame-based application 104 playing on a mobile device 114 that includes a Flash Player 116."). The opinions of Defendants' expert in this regard are unpersuasive. (*See* Dkt. #136, Ex. 7, Feb. 19, 2026 Medvidovic Decl. ¶¶ 87–89).

> Defendants submit:
>
> Defendants are mindful that in the prior *JP Morgan Chase* case, this Court rejected the argument that "application" should be construed to mean "frame-based application." Ex. 10 at 16-19. In reaching that conclusion, the Court observed that "the specification refers to Java, .NET and BREW as examples of mobile application development platforms." *Id.* (citing ['192 Patent at] 3:40-47).
>
> Crucially, the litigants do not appear to have alerted the Court that this language does not appear in the parent '910 patent. Although the '192 patent purports to claim priority back to the '910 patent through a series of continuation applications, the '192 patent should, in fact, have been filed as a continuation-in-part, as the patentees added more than a column of new material. *Compare* Ex. 1, 3:29-52 *with* Ex. C, 3:17-31. This new material, including the language cited by the Court, was added in 2012, more than six years after Wapp's claimed priority date, and therefore cannot be used to support Wapp's broad claim interpretation. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004) (finding error in relying on new matter added in a continuation-in-part to construe parent patent); *see also Arthrex, Inc. v. Smith & Nephew, Inc*, No. 2:15-CV-1047-RSP, 2016 WL 4211504, at *21 (E.D. Tex. Aug. 10, 2016); *iLife Techs., Inc. v. Body Media, Inc.*, 90 F. Supp. 3d 415, 427 (W.D. Pa. 2015) ("Disclosures constituting new matter should not be used to construe claim terms appearing in the parent patent, even if the claim terms are common.").

(Dkt. #144, at p. 26). The authorities cited by Defendants pertain to whether a disclosure in a continuation-in-part patent can be used when construing terms in a parent patent. Here, the disclosure contested by Defendants ('192 Patent at 3:40–47) appears in the '192 Patent itself, and Plaintiff's expert opines that "Java, .NET, and BREW could be used to develop mobile applications that are not 'frame-based.'" (Dkt. #136, Ex. 6, Feb. 19, 2026 Malek Decl. ¶ 55).

Although not all of the patents-in-suit expressly include disclosure regarding Java, .NET, and BREW, the patents-in-suit incorporate-by-reference United States Provisional Patent Application No. 60/689,101. *See, e.g.,* '864 Patent at 1:7–14. During the April 23, 2026 hearing, Defendants discussed *FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326, 1331–32 (Fed. Cir. 2025), and *DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911 (Fed. Cir. 2024) (discussed by *FMC*). In those cases, the "evolution," "progression," or "material[] alter[ation]" of patent applications—such as language in an earlier application being omitted in a later application—was taken into account during claim construction even though the later application incorporated-by-reference the earlier application. *See FMC*, 145 F.4th at 1332. Defendants have not demonstrated that these case prohibit the Court from considering the incorporated-by-reference material as informative context regarding how the patentee used the term at issue. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1365–66 (Fed. Cir. 2016) ("provisional applications incorporated by reference are effectively part of the specification as though it was explicitly contained therein") (citations and internal quotation marks omitted).

Finally, to whatever extent the parties have a dispute regarding priority dates (*see* Dkt. #144, at pp. 28–30), Defendants have not persuasively demonstrated that any such dispute affects the present claim construction proceedings. Defendants requested during the April 23, 2026 hearing that the Court, in ruling on the present claim construction dispute, should determine a priority date. No such request appears in Defendants' Responsive Claim Construction Brief, and in any event Defendants have not persuasively demonstrated that any priority date determination is ripe or appropriate as part of these claim construction proceedings.

The Court thus reaches the same conclusion here as in *JPMC*. *See JPMC* at 16–19. The Court hereby expressly rejects Defendants' proposed construction, and no further construction is

necessary. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes "application" to have its **plain meaning**.

**4. "an application to enable a user to modify a photo on the mobile device . . ."**

| "an application to enable a user to modify a photo on the mobile device, wherein the application is developed using a software authoring platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application" ('192 Patent, Claim 60) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning (not product-by-process) | Product-by-Process<br><br>Product:<br>    "an application to enable a user to modify a photo"<br><br>Process:<br>    "developed using a software authoring platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application" |

(Dkt. #132, Ex. A at p. 3; *id.*, Ex. B at pp. 13–14; Dkt. #159, Ex. A at p. 1).

### a. The Parties' Positions

Plaintiff argues:

Claim 60 is not a product-by-process claim because it does not claim merely a product ("application") defined by the process of its manufacture. Rather, it claims a *system* that *comprises* both the application *and* requires a software authoring platform with specific structural and functional capabilities. The "wherein" clause does not merely describe how the application was made; it defines a structural relationship between the application and a presently-existing, presently-configured authoring platform. The authoring platform is a component of the claimed system, not a recitation of a bygone manufacturing step.

(Dkt. #136, at p. 13.)    Plaintiff submits that when words can connote either a structural characteristic or a process of manufacture, the default meaning is structural.    (*Id.*, at p. 14.) Plaintiff also submits that "no prior defendant has asked the Court to interpret Claim 60 as a product-by-process claim." (*Id.*) (citations omitted).

Defendants respond that "the 'application to enable a user to modify a photo' (a product) is defined by the process by which it is made ('developed using' the software authoring platform)." (Dkt. #144, at pp. 1–2).    Defendants argue that "[t]he phrase 'developed using a software authoring platform' is equivalent to phrases the Federal Circuit identified as supporting a product-by-process construction." (*Id.*, at p. 2) (citations omitted).    Defendants also argue that "Claim 60's focus on the product and not the process is also evident from dependent claims 61–69, which further limit only the 'application' and not the platform or use of the platform." (*Id.*, at p. 2) (citation omitted).    Defendants urge that "[t]he 'software authoring platform' is only passively referred to as the tool used to develop the 'application,' not positively claimed or structurally defining the 'application.'" (*Id.*, at 3).

Plaintiff replies that "Defendants' response fixates on the phrase 'developed using' while ignoring the claim as a whole, the claim's grammar, and binding precedent accepting structural interpretation as the default." (Dkt. #151, at p. 5).    Plaintiff argues that "[t]he combination of these two structural components—the application and the software authoring platform—are the claimed system." (*Id.*).    Plaintiff also argues that "Defendants focus only on the application and largely ignore the claim's requirement for the 'software authoring platform'—which is a structure, not a process." (*Id.*).    Finally, Plaintiff argues that "process" refers to a series of "steps/actions," and "[m]erely using a structural software platform is nothing like such a series of steps/actions." (*Id.*, at 6).

### b. Analysis

"[A product-by-process] claim is 'one in which the product is defined at least in part in terms of the method or process by which it is made.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 158 n.* (1989) (citation omitted).

"Product-by-process claims are not specifically discussed in the patent statute. The practice and governing law have developed in response to the need to enable an applicant to claim an otherwise patentable product that resists definition by other than the process by which it is made." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). The Federal Circuit has further explained:

> We have held that, when considering the patentability of product claims that contain process limitations, claim scope is generally based on the product itself, not the process. *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985) ("[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself."). If the process limitation connotes specific structure and may be considered a structural limitation, however, that structure should be considered. *In re Garnero*, 412 F.2d 276, 279 (CCPA 1969) (holding that "interbonded one to another by interfusion" connotes structure to a claimed composite and should therefore be considered in the determination of patentability).
>
> * * *
>
> "[W]ords of limitation that can connote with equal force a structural characteristic of the product or a process of manufacture are commonly and by default interpreted in their structural sense, unless the patentee has demonstrated otherwise." *3M Innovative Props. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371–72 (Fed. Cir. 2003).

*In re Nordt Dev. Co., LLC*, 881 F.3d 1371, 1374–75 (Fed. Cir. 2018); *see Kamstrup A/S v. Axioma Metering UAB*, 43 F.4th 1374, 1381–82 (Fed. Cir. 2022).

Here, Claim 60 of the '192 Patent recites (emphasis added):

60. A system comprising:

> *an application* configured to enable a user to modify a photo on the mobile device, wherein *the application is developed using* a software authoring

platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application.

Plaintiff argues: "The phrase 'developed using' describes a continuing relationship between the application and the authoring platform. In mobile software development, an application is not merely 'made' by an authoring platform and then permanently divorced from it. The authoring platform is the environment through which the application is iteratively built, tested, debugged, and deployed." (Dkt. #136, at p. 14) (citing '192 Patent at 14:19–23 ("During development of an application for a mobile device, an application author may transfer and play the application hundreds of times (development life cycles) on the targeted mobile device before identifying and correcting all system resource problems within the application.")).

Plaintiff's argument—that this language "defines a structural relationship between the application and a presently-existing, presently-configured authoring platform" (Dkt. #136, at p. 13)—is not consistent with the plain import of the claim language. Whereas Claim 1 of the '192 Patent, for example, recites "A *system for developing* an application for a mobile device comprising: *a software authoring interface configured to . . .*," Claim 60 recites "the application is *developed using* a software authoring platform configured to . . . ." Even in light of Plaintiff's cited authority that language susceptible to a structural reading is "by default" treated as structural, *In re Nordt*, 881 F.3d at 1375, the entire recital after the "wherein" in Claim 60 recites *how* the application is "developed," which on its face recites limitations as to the *process* of developing the application ("*using* a software authoring platform configured to . . ."). *See, e.g., Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ("obtainable by"); *Kamstrup*, 43 F.4th at 1382 ("being cast in one piece"); *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1354 ("derived from"). Plaintiff's suggestion that it is significant that the claim recites "*is*

developed" rather than "*was* developed" (Dkt. #136, at p. 14), which Plaintiff reiterated at the April 23, 2026 hearing, is unpersuasive.  Either way, the software authoring platform is recited as part of the system's *development*, not as part of what the system *is*.

Finally, Plaintiff cites Federal Circuit decisions in which product-by-process claims included explicit preambles, namely *In re Thorpe*, 777 F.2d at 696 ("The product of the process of . . ."), and *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 794 (Fed. Cir. 2019) ("A product produced by the process of . . ."), but Plaintiff has not demonstrated that this is a legal requirement for product-by-process treatment.  *See In re Thorpe*, 777 F.2d at 697 ("[p]roduct-by-process claims are not specifically discussed in the patent statute").

The Court therefore hereby finds that **Claim 60 of the '192 Patent is a product-by-process claim**.

### 5. "software [authoring/testing] interface . . ." Terms

| "software authoring interface" ('192 Patent, Claims 1–2) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning. (not governed by 35 U.S.C. § 112 ¶ 6) | "an interface for writing the mobile application" |

**"a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the software authoring interface is further configured to simulate a network connection state encountered by the mobile device"**

('192 Patent, Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning.<br>(not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Functions:<br>    "software authoring," "simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application," and "simulate a network connection state encountered by the mobile device"<br><br>Structure:<br>    Indefinite |

**"software authoring interface is configured to enable a user to select from one or more connection simulations for testing how well mobile content performs on a mobile device"**

('192 Patent, Claim 2)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning.<br>(not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Functions:<br>    "software authoring" and "enable a user to select from one or more connection simulations for testing how well mobile content performs on a mobile device"<br><br>Structure:<br>    Indefinite |

| **"software testing interface"** ('678 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning. (not governed by 35 U.S.C. § 112 ¶ 6) | "an interface for testing the mobile application" |

| **"a software testing interface configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application; wherein the bandwidth availability is based at least in part on bandwidth data predetermined from interactions between one or more mobile devices and at least one operator network"** ('678 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning. (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). Functions: "software testing" and "simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the applications; wherein the bandwidth availability is based at least in part on bandwidth data predetermined from interactions between one or more mobile devices and at least one operator network" Structure: Indefinite |

(Dkt. #132, Ex. A at p. 4 & 6; *id.*, Ex. B at pp. 12–13 & 16; Dkt. #159, Ex. A at pp. 13–16).

### a. The Parties' Positions

Plaintiff argues that the Court should reaffirm its finding from prior cases that "software authoring interface" and "software testing interface" have their plain meaning, and Plaintiff argues that "there is no need to re-word these already well-understood terms that a lay jury can readily understand." (Dkt. #136, at pp. 15 & 16) (citations omitted). Plaintiff also submits that, as in prior cases, the Court should find that the "software [authoring/testing] interface . . ." terms are not means-plus-function terms. (*Id.*, at p. 15) (citations omitted). In particular, Plaintiff argues that "'interface' is structural and does not invoke means plus function." (*Id.*, at p. 18) (citations omitted). Alternatively, Plaintiff argues that "even if means plus function did apply (it does not), the specification provides extensive detail demonstrating the structure and support for the claim limitations." (*Id.*, at p. 17; *see id.*, at pp. 19–22).

Defendants respond that "[t]he claim limitation does not need to be purely functional for § 112 ¶ 6 to apply, but rather § 112 ¶ 6 applies when the claim fails to recite 'sufficient' structure for performing each claimed function." (Dkt. #144, at p. 5) (discussing *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015)). Defendants argue that "[t]here is no evidence, and it is contrary to their plain meaning to suggest that a 'software [authoring/testing] interface' would include structure to emulate or simulate network characteristics including bandwidth availability." (*Id.*, at p. 18). "In addition," Defendants argue, "the 'software authoring interface' and 'software testing interface' are insufficient to perform the claimed function of emulating or simulating network characteristics because the generic recitation of these interfaces is not sufficient to perform the potentially complex function of emulating network characteristics." (*Id.*, at p. 19). As for corresponding structure, Defendants argue:

> Wapp contends that the windows of Figs. 5 and 9-12 (including a display and user interface) are corresponding structures to perform the functions of both

> (1) emulation of network characteristics and (2) emulation of a mobile device. Op. Br. 21-22. Wapp is wrong because a user interface window cannot possibly be enough structure to emulate network characteristics or mobile device. In addition, the interfaces are not even linked to these particular emulation functions in the specifications and instead merely allow user interaction and display information.

(*Id.*, at p. 20).

Plaintiff replies that "Defendants did not cite *any* cases where the court found the purported nonce word to have a definite structural meaning but nonetheless held the term to be MPF."  (Dkt. #151, at p. 6).  Plaintiff argues that Defendants misinterpret *Williamson* as purportedly setting forth two alternatives rather than, as discussed by the Federal Circuit (and in the *Manual of Patent Examining Procedure*, which the Federal Circuit has cited), a three-prong test that is satisfied only when all three prongs are satisfied.  (*Id.*, at p. 7; *see id.*, at p. 8 (citing, e.g., *VDPP LLC v. Vizio, Inc.*, No. 2021-2040, 2022 WL 885771, at *7–*8 (Fed. Cir. Mar. 25, 2022) (discussing evidence that "'processor' and 'storage' *do* connote structure to a skilled artisan")).  Plaintiff argues that the Court should reaffirm its *Wells Fargo* findings, such as that "to whatever extent the word 'interface' alone might be deemed to lack sufficient structural connotations, 'the presence of modifiers' imparts structural meaning to the disputed terms."  (*Id.*, at p. 10) (quoting *Wells Fargo* at 20) (quoting *Williamson*, 792 F.3d at 1351).

### b.  Analysis

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and

clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)). In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word." 792 F.3d at 1350.

Here, Claim 1 of the '192 Patent, for example, recites:

1. A system for developing an application for a mobile device comprising:

a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the software authoring interface is further configured to simulate a network connection state encountered by the mobile device.

In *Wells Fargo*, the Court construed "a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application . . . further configured to simulate a network connection state encountered by the mobile device," "the software authoring interface is configured to enable a user to select from one or more connection simulations for testing how well mobile content performs on the mobile device," and "a software testing interface configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application" to have their plain meaning. *Wells Fargo* at 20–21.

The Court in *Wells Fargo* analyzed at length, and rejected, the defendants' proposal to construe "software authoring interface" and "software testing interface" terms in the '192 Patent and the '678 Patent as means-plus-function terms. *See id.* at 11–21; *see, e.g., Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1368 (Fed. Cir. 2022).

In the present case, Defendants propose non-means-plus-function constructions for "software authoring interface" and "software testing interface." As to those terms, Defendants do not persuasively justify replacing "authoring" with "writing." *See* '192 Patent at 5:21–25 (referring to an "authoring environment").

Defendants propose means-plus-function constructions for larger terms that include "software authoring interface" and "software testing interface." *Wells Fargo* determined that

"software authoring interface" and "software testing interface" connote structure. *See Wells Fargo* at 11–21. Defendants in the present case do not contest this but nonetheless maintain that the claim limitations at issue are means-plus-function. Defendants submit that, under *Williamson*, a non-means terms is subject to means-plus-function treatment "if the challenger demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" 792 F.3d at 1348 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

Defendants argue that *Wells Fargo* addressed the so-called "first prong" or "prong 1(a)" of *Williamson*, namely whether the claim language connotes structure. Defendants do not contest the *Wells Fargo* finding in that regard. Defendants argue that *Wells Fargo* did not address the so-called "second prong" or "prong 1(b)," namely whether the limitations here at issue recite function without reciting sufficient structure for performing that function. 792 F.3d at 1348–49.

The parties agree in the present case that "simultaneously visually emulate, via one or more profile display windows" in the '192 Patent means "emulate simultaneously, and display one or more windows showing resources of the mobile device that are available to the application," and the parties agree that "simultaneously visually simulate, via one or more profile display windows" in the '678 Patent means "emulate simultaneously, and display one or more windows showing resources of the mobile device that are available to the application." Dkt. No. 159, Ex. A at 31.

Defendants argue that "the specifications describe the user interfaces for authoring/testing software as separate and distinct from the network simulator interface and simulator for emulating or simulating network characteristics." (Dkt. #144, at p. 18) (citation omitted). As

noted above, the agreed-upon claimed functionality includes displaying windows in a user interface.   Defendants argue that "the 'software authoring interface' and 'software testing interface' are insufficient to perform the claimed function of emulating or simulating network characteristics because the generic recitation of these interfaces is not sufficient to perform the potentially complex function of emulating network characteristics," and "[a]s Wapp's expert admits, these functions can take over 100,000 lines of code."   (*Id.*, at p. 19) (citing *id.*, Ex. A, Mar. 9, 2026 Malek Decl. at 55:9–56:19).

Plaintiff persuasively cites the *Manual of Patent Examining Procedure* ("MPEP") § 2181 (and decisions citing MPEP § 2181), which states (emphasis added):

> [E]xaminers will apply 35 U.S.C. 112(f) to a claim limitation if it meets the following 3-prong analysis:
>       (A) the claim limitation uses the term "means" or "step" or a term used as a substitute for "means" that is a generic placeholder (also called a nonce term or a non-structural term having no specific structural meaning) for performing the claimed function;
>       (B) the term "means" or "step" or the generic placeholder is modified by functional language, typically, but not always linked by the transition word "for" (e.g., "means for") or another linking word or phrase, such as "configured to" or "so that"; *and*
>       (C) the term "means" or "step" or the generic placeholder is not modified by sufficient structure, material, or acts for performing the claimed function.

(Dkt. #136, Ex. 12, *Manual of Patent Examining Procedure* § 2181) (Nov. 2024) (p. 508 of 536 of Ex. 12) (emphasis added).   Plaintiff also persuasively cites *Zeroclick*, in which the Federal Circuit stated that "[w]hen evaluating whether a claim limitation invokes § 112, ¶ 6, the essential inquiry remains 'whether the words of the claim are understood by [POSITAs] to have a sufficiently definite meaning as the name for structure.'"   *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) (quoting *Williamson*, 792 F.3d at 1348)).

Defendants' reliance on *Egenera, Inc. v. Cisco Systems, Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020), which Defendants emphasized at the April 23, 2026 hearing, is unavailing.

Defendants overread the Federal Circuit's analysis in *Egenera*, which addressed a "logic" term that was found to encompass "software, firmware, or circuitry" and was found to refer to "whatever may perform" the function.   Further of note, in *Egenera* "[t]he [district] court concluded that the specification was . . . 'consistent with an understanding of logic as an abstraction for the set of steps designed to accomplish a stated function.'" *Id.* (citation omitted).

In the present case, by contrast, the disputed terms are not merely functional placeholders.  *See id.* As discussed at length by the Court in *Wells Fargo*, the terms "software authoring interface" and "software testing interface" are not nonce terms but rather have structural meaning.   *Wells Fargo* at 11–21.

Alternatively and in addition, even assuming for the sake of argument that Defendants' characterization of "prong 1(b)" is accurate, the specification discloses:

> FIGS. 9, 10, 11 and 12 show exemplary windows that allow a user to interact with emulator 101 for configuring and testing operation of application 104 within model 102 when simulating connection to a wireless network.

'192 Patent at 10:34–38.   The specification thus supports understanding "software authoring interface" and "software testing interface" in relation to simulation of network connections. Defendants' arguments reflect potential disputes regarding whether claims comply with the enablement and written description requirements under 35 U.S.C. § 112(a) (formerly 35 U.S.C. § 112, ¶ 1).   Disclosures regarding operator development server 808 simulating network events, as well as disclosures in which emulator 101 and device model 102 are distinct from a display 110, do not compel otherwise.   *See* '192 Patent at 4:56–60 & 11:28–38.   The opinions of Defendants' expert are likewise unpersuasive.  (*See* Dkt. #136, Ex. 7, Feb. 19, 2026 Medvidovic Decl. ¶¶ 117–29).   Defendants have not rebutted the presumption against means-plus-function treatment for these terms.

The Court therefore hereby construes the "software authoring interface . . ." terms and the "software testing interface" terms to have their **plain meaning**.

**6. "software authoring platform . . ."**

| **"a software authoring platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application"** ('192 Patent, Claim 60) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | If the court determines the software authoring platform is a requirement of the claim, it is a means-plus-function term under 35 U.S.C. § 112 ¶ 6 (pre-AIA). Software Authoring Platform functions: "simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application" Structure: Indefinite |

(Dkt. #132, Ex. A at p. 17; *id.*, Ex. B at p. 14; Dkt. #159, Ex. A at pp. 12–13.)

**a. The Parties' Positions**

Plaintiff incorporates-by-reference its arguments as to the "software authoring interface" and "software testing interface" terms addressed above. (Dkt. #136, at p. 23.) Plaintiff also submits that in a petition for *Inter Partes* Review ("IPR"), the Capital One Defendants were obligated to identify any means-plus-function terms and did not do so for these terms. (*Id.*) (citations omitted). Further, Plaintiff argues that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term. (*Id.*) Finally, Plaintiff notes that the defendants in JPMC did not propose a means-plus-function construction. (*Id.*, at pp. 25–26).

Defendants respond that "a system used to author software is not sufficient structure to emulate hardware characteristics of a mobile device," and "[w]hile the '192 patent describes that '[i]n one embodiment, emulator 101 is integrated with flash development tool 112 to form a [broader] authoring environment 122 that facilitates development and testing of application 104,' *id.* 5:21–25, that does not change the fact that the frame-based development tool 112 is separate and distinct from the emulator of hardware characteristics." (Dkt. #144, at pp. 14 & 15). Further, Defendants argue that "a generic 'software authoring platform' is not sufficient structure to perform a potentially complex function like emulating characteristics of a mobile device." (*Id.* at p. 15). Defendants urge that "this limitation would cover any software for performing the claimed function, exactly what § 112 ¶ 6 was meant to prevent." (*Id.*) As for corresponding structure, Defendants argue that "the specifications fail to disclose any algorithm for emulator 101 or device model 102, instead describing them only at a high-level by their intended end-result functions." (*Id.*, at p. 16) (citations omitted).

Plaintiff replies that "Defendants concede that software authoring platform and the software [authoring/testing] interface terms have a definite known structure," and "Defendants further concede that the specification discloses the structure of an authoring environment with an integrated emulator." (Dkt. #151, at p. 10) (citing Dkt. #144, at pp. 6 & 15).

### b. Analysis

As a threshold matter, Plaintiff notes that the Capital One Defendants did not identify this as a means-plus-function term and did not assert indefiniteness in *Inter Partes* Review ("IPR") proceedings, but this does not significantly affect the Court's analysis because an IPR petition cannot assert indefiniteness. *See* 35 U.S.C. § 311(b); *see also Cuozzo Speed Tech., LLC v. Lee*,

136 S. Ct. 2131, 2141–42 (2016); *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 (Fed. Cir. 2020).

Nonetheless, as discussed above regarding the "software [authoring/testing] interface . . ." terms, Plaintiff persuasively demonstrates that Defendants' interpretation of *Williamson* setting forth a so-called "prong 1(b)" is not a distinct basis for rebutting the presumption against means-plus-function treatment for non-means terms. Also, Plaintiff's expert persuasively opines that the term "software authoring platform" connotes structure in the relevant art. (*See* Dkt. #136, Ex. 6, Feb. 19, 2026 Malek Decl. ¶¶ 84–87, 164–68).

Alternatively and in addition, even assuming for the sake of argument that Defendants' characterization of "prong 1(b)" is accurate, the specification discloses:

> In one embodiment, emulator 101 is integrated with flash development tool 112 to form an authoring environment 122 that facilitates development and testing of application 104 without the need to continually load application 104 into mobile device 114.

'192 Patent at 5:21–25. This comports with understanding an authoring platform as potentially including emulation. Defendants' argument reflects potential disputes regarding whether claims comply with the enablement and written description requirements under 35 U.S.C. § 112(a) (formerly 35 U.S.C. § 112, ¶ 1). This argument does not persuasively demonstrate that the disputed terms are subject to 35 U.S.C. § 112(f) (formerly 35 U.S.C. § 112, ¶ 6). Also, Defendants' expert opines that "software authoring platform" is "a nonce term for a base technology for writing mobile applications." (Dkt. #136, Ex. 7, Feb. 19, 2026 Medvidovic Decl. ¶ 154; *see id.* at ¶¶ 151–54). This characterization of "base technology" tends to reinforce that the term "software authoring platform" connotes structure and that Defendants' arguments pertain to § 112(a) rather than § 112(f).

The Court therefore hereby construes "a software authoring platform configured to simultaneously visually emulate, via one or more profile display windows, a plurality of hardware characteristics indicative of performance of the mobile device when executing the application" to have its **plain meaning**.

### 7. "software/software instructions/instructions" Terms

<table>
<tr><td colspan="2" align="center"><b>"software configured to simulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the network characteristics are based on data of interaction with networks in non-simulated environments"</b><br>('864 Patent, Claim 1)</td></tr>
<tr><td><b>Plaintiff's Proposal</b></td><td><b>Defendants' Proposed Construction</b></td></tr>
<tr><td>With respect to the terms that overlap with the terms in the agreed constructions, those terms should be construed in accordance with the agreed constructions. With respect to the other terms, no construction necessary beyond plain meaning (not governed by 35 U.S.C. § 112 ¶ 6)</td><td>Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Function:<br>"simulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application; wherein the network characteristics are based on data of interaction with networks in non-simulated environments"<br><br>Structure:<br>Indefinite</td></tr>
</table>

| **"the software is further configured to create one or more scenarios that include scripts that impact either the performance of the application, or the network, or both"**<br>('864 Patent, Claim 8) | |
| --- | --- |
| **Plaintiff's Proposal** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Function:<br>     "create one or more scenarios that include scripts that impact either the performance of the application, or the network, or both"<br><br>Structure:<br>     Indefinite |

| **"software instructions for developing an application"**<br>('811 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposal** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Functions/Results:<br>     "developing an application to be run on a mobile device," and "when executed, cause a computer to: display a list of a plurality of mobile device models from which a user can select, wherein each model includes one or more characteristics indicative of a corresponding mobile device; simulate at least one of the one or more characteristics indicative of the mobile device corresponding to the selected mobile device model; simulate one or more characteristics indicative of a network on which the mobile device corresponding to the selected mobile device model can operate; monitor utilization of a plurality of resources over time as the application is running; display simultaneously two or more graphical images of the application's resource utilization, wherein each graphical image relates to a different resource; correspond the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization"<br><br>Structure:<br>     Indefinite |

| "software instructions for developing an application" ('811 Patent, Claim 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Functions/Results:<br>   "developing an application to be run on a mobile device," and "when executed, cause a computer to: display a list of a plurality of mobile devices from which a user can target a particular device; model one or more characteristics indicative of the targeted mobile device; monitor utilization of a plurality of resources over time as the application is running; display simultaneously two or more graphical images of the application's resource utilization as it is running, wherein each graphical image relates to a different resource and is synched in time as the application is running; identify one or more functions of the application responsible for utilization of a specific displayed resource at a given time"<br><br>Structure:<br>   Indefinite |

| "software instructions for developing an application" ('811 Patent, Claim 22) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). <br><br> Functions/Results: <br> "developing an application to be run on a mobile device," and "when executed, cause a computer to: simulate one or more characteristics indicative of the mobile device, wherein the one or more characteristics indicative of the mobile device include at least one of processor type, processor speed, storage access speed, RAM size, storage size, display width, display height, pixel depth, processor availability, RAM availability or storage availability; monitor utilization of a plurality of resources over time as the application is running, wherein the monitored resources include at least one of processor usage and RAM usage; display one or more graphical images of the application's resource utilization; correspond the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization; initiate transmission of the application that is being developed to one or more physical versions of the mobile device" <br><br> Structure: <br> Indefinite |

| **"software instructions for developing an application to be run on a mobile device"** <br> ('579 Patent, Claim 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). <br><br> Functions/Results: <br> "developing an application to be run on a mobile device" and "when executed, cause a computer to: select one or more characteristics associated with a mobile device; monitor utilization of one or more resources of the mobile device over time by an application running on a simulation of the mobile device; display a representation of one or more of the monitored resource; correspond the utilization of a specific displayed resource at a given time with one or more functions, or code, or both of the application responsible for that utilization; initiate transmission of the application on a simulation of the mobile device, or to the physical mobile device, or both" <br><br> Structure: <br> Indefinite |

| **"the instructions initiate transmission of the application that is being developed to one or more physical versions of a mobile device corresponding to the selected mobile device"** <br> ('811 Patent, Claim 2) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). <br><br> Function: <br> "initiate transmission of the application that is being developed to one or more physical versions of a mobile device corresponding to the selected mobile device" <br><br> Structure: <br> Indefinite |

| **"the instructions simulate one or more characteristics, including bandwidth, indicative of a network on which the mobile device can operate"** ('811 Patent, Claim 24) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). Function: "simulate one or more characteristics, including bandwidth, indicative of a network on which the mobile device can operate" Structure: Indefinite |

| **"the instructions initiate loading of at least one of the one or more characteristics from at least one of a remote server and a computer-readable media, wherein the physical mobile device is connected to at least one of the internet, a wireless network and the remote server, to enable a user to interact with and test the application"** ('579 Patent, Claim 16) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA). Function: "initiate loading of at least one of the one or more characteristics from at least one of a remote server and computer readable medium, where the physical mobile device is connected to at least one of the internet, a wireless network and the remote server, to enable a user to interact with and test the application" Structure: Indefinite |

| "the instructions display simultaneously two or more representations of the monitored resource" ('579 Patent, Claim 27) ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Function:<br>    "display simultaneously two or more representations of the monitored resource"<br><br>Structure:<br>    Indefinite |
| "the instructions allow scripts to be created that simulate actions capable of being performed by the mobile device" ('579 Patent, Claim 33) ||
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning (not governed by 35 U.S.C. § 112 ¶ 6) | Means-plus-function under 35 U.S.C. § 112 ¶ 6 (pre-AIA).<br><br>Function:<br>    "allow scripts to be created that simulate actions capable of being performed by the mobile device"<br><br>Structure:<br>    Indefinite |

(Dkt. #132, Ex. A at pp. 10–16; *id.*, Ex. B at pp. 22–29; Dkt. #159, Ex. A at pp. 2–12).

### a. The Parties' Positions

Plaintiff argues that "Defendants' theory that the terms containing 'software'/'software instructions'/'instructions' from the '864, '811, and '579 Patents should be treated as means plus function fails for many of the same reasons discussed above for the 'software authoring/testing interface' and 'software authoring platform' terms." (Dkt. #136, at p. 27.) Plaintiff argues that Defendants cannot overcome the presumption against means-plus-function treatment for this

non-means term, and Plaintiff notes that "these '811 and '579 claims follow the well-known claiming format known as 'computer readable medium' (CRM) software claims." (*Id.* at 27 & 28; *see id.* at 28–29.)  Alternatively, Plaintiff argues that "even if the claims were means plus function, supporting disclosure is found throughout the patents." (Dkt. #136, at p. 30) (citations omitted).

Defendants respond that "'software' and 'software instructions' are not sufficient structure or instructions to perform the claimed functions to simulate or model characteristics of mobile device or simulate characteristics of a network." (Dkt. #144, at p. 7).  Defendants argue that "[t]he only structure in these claims is a generic reference to 'software' and 'software instructions,' which are effectively nonce words like 'means,' except that they are defined by their functions," and "the claimed functions do not define the 'software' or 'software instructions.'" (*Id.*; *see id.* at pp. 7–11).  Defendants also submit that Plaintiff has not identified any corresponding structure, arguing that "[i]n doing so, Wapp has forfeited any rebuttal," and Defendants also argue that "the specifications do not disclose adequate structure clearly linked to the claimed functions to (1) simulate network characteristics and (2) simulate or model one or more characteristics of the mobile device." (*Id.*, at p. 11) (citation omitted).  For example, Defendants argue that "the specifications recite only the desired end results of the model algorithms, without any detail as to how those results are achieved." (*Id.*, at p. 13).

Plaintiff replies that "Defendants concede that the limitations can be readily implemented using lines of software code (also known as instructions), thus the software/instructions provide sufficient structure," and Plaintiff argues that "Defendants cite no case that would support the premise that complexity of implementation would subject an otherwise non-MPF claim limitation to an MPF interpretation." (Dkt. #151, at p. 9) (citing Dkt. #144 at pp. 7–8).

### b. Analysis

Claim 1 of the '811 Patent, for example, recites:

1. *A non-transitory, computer-readable medium comprising software instructions for developing an application to be run on a mobile device*, wherein the software instructions, when executed, cause a computer to:

    display a list of a plurality of mobile device models from which a user can select, wherein each model includes one or more characteristics indicative of a corresponding mobile device;

    simulate at least one of the one or more characteristics indicative of the mobile device corresponding to the selected mobile device model;

    simulate one or more characteristics indicative of a network on which the mobile device corresponding to the selected mobile device model can operate;

    monitor utilization of a plurality of resources over time as the application is running;

    display simultaneously two or more graphical images of the application's resource utilization, wherein each graphical image relates to a different resource;

    correspond the utilization of a specific displayed resource at a given time with one or more functions of the application responsible for that utilization.

Plaintiff persuasively distinguishes the *Egenera* case cited by Defendants because, whereas *Egenera* addressed a "logic" term that was found to encompass "software, firmware, or circuitry," in the present case there is no dispute that the claimed "instructions" refer to software. (Dkt. #151, at p. 9) (discussing *Egenera, Inc. v. Cisco Sys.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020)). Also, the Federal Circuit there agreed that "logic" referred to "whatever may perform" the function. *Id.* Here, "instructions" are not merely functional placeholders. *See id.*

Also, the claims here at issue, namely Claims 1, 2, 9, 22, and 24 of the '811 Patent and Claims 15, 16, 27, and 33 of the '579 Patent are so-called "*Beauregard* claim," which are "claim[s] to a computer readable medium (e.g., a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process." *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1373 (Fed. Cir. 2011) (discussing *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)). Defendants argue that whereas "[i]f the CRM claims instead recited narrow limitations that provided an indication as to how the claimed

functions are actually performed, those limitations may be sufficient structure to perform the claimed functions (and thus fall outside the boundaries of § 112 ¶ 6)," "the specific asserted claims here recite broad and potentially complex functions at a high-level, and those functions are intended end results (rather than instructions to obtain those results)" (Dkt. #144, at p. 10), but Defendants present no legal authority to support means-plus-function treatment of *Beauregard* "instructions." *Cf. Zeroclick*, 891 F.3d at 1008 (finding that "program" and "user interface code" were not nonce words).

The Court therefore hereby construes these disputed terms to have their **plain meaning**.

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 1st day of May, 2026.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

Page 47 of 47